THE STATE OF MONTANA ex rel. ROBERT W. CHAM-
BERS, Petitioner and Respondent, v. SCHOOL DISTRICT
NO. 10 of the COUNTY OF DEER LODGE et al., Re-
spondents and Appellants.

No. 11685.
Submitted May 14, 1970.
Decided July 28, 1970.
Rehearing Denied Aug. 27, 1970.
472 P.2d 1013.

John L. McKeon, argued, Anaconda, William B. Ball, argued,
Harrisburg, Pa., Edward D. Yelsa, County Atty., Anaconda, for
respondents and appellants; Ward Shanahan, argued, amicus
curiae, Helena.

John H Jardine, argued, Whitehall, Rex. F. Henningsen, argued, Butte, for petitioner and respondent; Leo Kottas, Sr., argued, amicus curiae, Helena.

PER CURIAM:

This is an appeal from a judgment and order granting a peremptory writ of prohibition against the school district, school board and superintendent of schools of School District No. 10 of Deer Lodge County, Montana. School District No. 10 operated the Anaconda High School in the city of Anaconda, Montana, a public high school supported entirely by public funds.

There is a Roman Catholic parochial high school known as Anaconda Central High School located within the boundaries of School District No. 10 in the city of Anaconda.

The fact situation in this cause as disclosed by the record shows that on April 28, 1969, the trustees of School District No. 10 held a special meeting to consider holding a special election in order to submit to the qualified electors the questions of special levies for the operation of the Anaconda High School and other matters. At this special meeting a resolution was passed which provided, so far as pertinent here:

"* * * that a High School Special Levy be held on May 27, 1969 in the amount of Sixty-Five Thousand, One Hundred Sixty-Two Dollars ($65,162.00), being approximately 4.9 mills. for the purpose of employing eight additional high school teachers as full time employees of School District No. 10 to provide the standard course of instruction approved by the County Superintendent for High Schools to students currently enrolled in the parochial High School in Deer Lodge County, Montana and that these teachers give such standard course of instruction to these students on the premises of the respective parochial high school from July 1, 1969 to July 1, 1970 and that the precincts and polling places be the same as those for the Elementary Levy."

424

Pursuant to the resolution adopted by the board of trustees, the school district caused ballots to be prepared which contained the following language, with boxes for indicating an affirmative or negative vote therefor:

"Make an X in the vacant square before the words For an additional high school tax levy to raise the sum of Sixty-Five Thousand, One Hundred Sixty-Two Dollars ($65,162.00) for the purpose of employing teachers as full time employees of School District No. 10 to provide the standard course of instruction, approved by the County Superintendent for High Schools, to students currently enrolled in the parochial high school in Deer Lodge County, Montana, said course of instruction to be given on the premise of the parochial high school.

"Shall a special high school tax levy be made in addition to the levies authorized by law in such number of mills as may be necessary to raise the sum of Sixty-Five Thousand, One Hundred Sixty-Two Dollars ($65,162.00), for the purpose of:

"1. Paying teachers to teach on the premises of the parochial high school."

Respondent, a resident taxpayer of School District No 10, on May 20, 1969, brought this action in the district court of Deer Lodge County to obtain a writ of prohibition directed against appellants herein, School District No. 10 of Deer Lodge County, Montana, and the board of trustees and superintendent of said school district, seeking to enjoin them them submitting to the qualified electors of the county, on May 27, 1969, a special tax levy for the purpose of hiring eight teachers as full time employees of the school district. It was alleged that the special levy was in violation of state and federal constitutional prohibitions.

An alternative writ was issued on May 20, 1969, ordering appellants to take the necessary steps to remove from the ballot the question relating to the special mill levy and prohibiting

them from submitting the question to the electors at the election of May 27, 1969, or to show cause on May 23, 1969, why such was not done.

On May 23, 1969, the district court granted a peremptory writ of prohibition. The writ did not by its terms order that the question be removed from the ballot or prohibit the question from being submitted to the electors, but provided:

"* * * that if said election to which said Alternative Writ and Petition was directed, is held, and the question thereupon relating to the raising of $65,162.00 by additional high school mill levy, and is passed by the electors, that said Peremptory Writ of Prohibition issue forthwith, permanently enjoining and restraining said respondents, and each of them, from thereafter levying, assessing, collecting or expending, or causing said additional tax levy of $65,162.00, to be levied, assessed, collected and expended, for the purposes set forth in the said question."

On Tuesday, May 27, 1969, the election was held and the question was submitted to the electors of Deer Lodge County, Montana. At this election 1,471 qualified electors voted in favor of the levy and 1,233 qualified electors voted against it.

From the judgment and order granting the peremptory writ of prohibition the school district, school board and superintendent of schools appealed.

The issues presented for review are two in number. As stated by the appellant the first is whether the Constitution of the United States or of the State of Montana prohibit a public school board from employing teachers, as full time employees of the school district, for the purpose of providing the standard course of secular instruction for high schools, as approved by the county superintendent of schools, to resident students of the county, for the reason that such students are enrolled in a parochial high school or, as stated by the respondent, does the Constitution of the State of Montana and the United States prevent appellant school district from making a special high school

tax levy for the purpose of employing and paying eight school teachers to teach students enrolled in a parochial high school on the premises of said high school?

Secondly, in the words of appellants, whether the free exercise clause of the First Amendment to the United States Constitution was violated by the district court's order which prohibits the appellants from collecting or spending the additional mill levy for teachers' salaries, solely by reason of the fact that the students who are to receive the benefit of the program are enrolled in a parochial high school.

Or, as stated by the respondent did the appellant school district act in violation of statutory authority and in excess of its jurisdiction in proposing a special high school tax levy to the voters of Deer Lodge County for the purposes set forth in issue No. 1 under section 75-4609, R.C.M.1947, as to special tax levy for high schools and section 75-3801, R.C.M.1947, as to district school taxes?

"Whenever the board of trustees of the local school district within which the high school is situated shall deem it necessary to raise money for high school purposes in addition to its revenues from county and state apportionments, a meeting of the board of trustees of the high school district shall be called and held to consider the calling of an election to vote upon the question of approving a special levy for high school purposes. If a majority of the board of trustees, as provided in section 75-4601, of the high school district attending such meeting shall determine that the proposed expenditures are necessary for the purposes of, altering, repairing or enlarging any high school or high schools of said district or for proper maintenance and operation of the high schools of said district or for acquisition of land for high school purposes, said trustees of the high school district shall ascertain and determine the number of mills required to be raised by special levy, and shall call an election for the purpose of submitting the question of making such additional levy to the qualified electors who are taxpayers

upon property within the high school district, and if approved by a majority vote of all the taxpayers voting at such election, the result of said election shall be certified to the board of county commissioners, and the levy approved by such majority vote shall be made upon all property within said high school district''

The emphasis of respondent is directed to this portion of the statute: *"If a majority of the board of trustees, as provided in section 75-4601, of the high school district attending such meeting shall determine that the proposed expenditures are necessary for the purposes of, altering, repairing or enlarging any high school or high schools of said district or for proper maintenance and operation of the high schools of said district"*. (Emphasis ours.)

Section 75-3801, R.C.M.1947, so far as pertinent to our discussion, provides that if the board of trustees of any school district deems it necessary to raise money by taxation in excess of the levy required to meet its foundation program "for the purpose of maintaining *the schools of said district,* or building, altering, repairing or enlarging any schoolhouse or houses *of such district,* for furnishing additional school facilities *for said district,* or for any other purpose necessary for the proper operation and maintenance of the *schools of said district,''* the board may fix and determine the amount required and submit it to an election.

The second portion of the statute provides for levies for district or county high schools and contains much the same language as the first portion and the words *"schools of said district, or county high school."*

This is a case of first impressions in our state and it has been exhaustively briefed by counsel for the parties and amicus curiae. We appreciate that the constitutional issue presented by this appeal, in one form or another, has been before various courts throughout our nation. We do not intend to discuss all the cases which have been urged upon us as authorities since it is

the constitutional provisions of our state where not in conflict with the provisions of the Constitution of the United States that should and will govern our decision.

To commence our discussion we should start at the beginning, the Enabling Act, passed by the Congress and approved on February 22, 1889, appearing as 25 Stat. 676.

The Enabling Act set forth the provisions that the people of Montana must comply with in order to be admitted into the Union on an equal footing with the original states. That the people of Montana did recognize this necessity is stated in the Preamble to our Constitution, which reads:

"We, the people of Montana, grateful to Almighty God for the blessings of liberty, in order to secure the advantages of a state government, do, in accordance with the provisions of the enabling act of Congress, approved the twenty-second of February, A.D. 1889, ordain and establish this constitution."

The Constitution was ratified by the people October 1, 1889.

The Enabling Act provided in § 4, in part as follows:

"And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said states:

"First. That perfect toleration of religious sentiment shall be secured and that no inhabitant of said states shall ever be molested in person or property on account of his or her mode of religious worship."

Paragraph Fourth of § 4, it provided:

"Fourth. That provision shall be made for the establishment and maintenance of systems of public schools, which shall be open to all the children of said states, and free from sectarian control."

In compliance with these provisions of the Enabling Act the constitutional convention adopted Ordinance No 1, which provided "BE IT ORDAINED: First. That perfect toleration of

religious sentiment shall be secured and that no inhabitant of the state of Montana shall ever be molested in person or property, on account of his or her mode of religious worship."

Under Fourth it was ordained: "That provision shall be made for the establishment and maintenance of a uniform system of public schools, which shall be open to all the children of said state of Montana and free from sectarian control."

Under Sixth it was ordained: "That the ordinances in this article shall be irrevocable without the consent of the United States and the people of said state of Montana."

The Constitution of Montana contained these provisions in compliance with the Enabling Act and the Ordinances:

"No religious or partisan test or qualification shall ever be required of any person as a condition of admission into any public educational institution of the state, either as teacher or student; nor shall attendance be required at any religious service whatever, nor shall any sectarian tenets be taught in any public educational institution of the state; nor shall any person be debarred admission to any of the collegiate departments of the university on account of sex." Art. XI, Sec. 9, Const. of Montana.

"It shall be the duty of the legislative assembly of Montana to establish and maintain a general, uniform and thorough system of public, free, common schools." Art. XI, Sec. 1, Const. of Montana.

"The public free schools of the state shall be open to all children and youth between the ages of six and twenty-one years." Art. XI, Sec. 7, Const. of Montana.

"It shall be the duty of the legislative assembly to provide by taxation, or otherwise, sufficient means, in connection with the amount received from the general school fund, to maintain a public, free common school in each organized district in the state, for at least three months in each year." Art. XI, Sec 6, Const. of Montana.

"Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." Art. XII, Sec. 11, Const. of Montana.

"No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association." Art. V. Sec. 35, Const. of Montana.

"Neither the legislative assembly, nor any county, city, town, or school district, or other public corporations, shall ever make directly or indirectly, any appropriation, or pay from any public fund or moneys whatever, or make any grant of lands or other property in aid of any church, or for any secterian purpose, or to aid in the support of any school, academy, seminary, college, university, or other literary, scientific institution, controlled in whole or in part by any church, sect or denomination whatever." Art. XI, Sec. 8, Const. of Montana.

"Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or a joint owner with any person, company or corporation, except as to such ownership as may accrue to the state by operation or provision of law." Art. XIII, Sec. 1, Const of Montana.

"The provisions of this constitution are mandatory and prohibitionory, unless by express words they are declared to be otherwise." Art. III, Sec. 29, Const. of Montana.

The school board contends that Anaconda Central High School as a part of the local Catholic Parochial School System is an integral and important part of the public and private educational system in Deer Lodge County. They cite that since it carries a sizeable portion of the total educational load, complies with

the standards set by the superintendent of public instruction, and enrollment of a student therein satisfies the compulsory education requirement of Montana law, that it pursues a valid and valuable secular function in providing secular education, in addition to its sectarian function. Further, that the proposed mill levy, for the purpose of hiring eight additional teachers as full time employees of the school district, to teach the standard course of instruction to students at the parochial high school, has a valid public purpose, that being to achieve the secular education of such students.

Respondent contends that the proposal of the school district is an obvious violation of the principle of separation of church and state as found in both the Constitution of the State of Montana and in the religious clauses of the First Amendment to the United States Constitution.

In view of these respective contentions it is apparent that the primary question raised in this appeal is whether the contemplated use of public funds would contravene the provisions of the First and Fourteenth Amendments to the Constitution of the United States and the provisions of Article XI, Sec. 8 of the Montana Constitution. These provisions of the United States Constitution, so far as pertinent here, in part provide:

"Amendment 1:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *".

"Amendment 14:

"* * * nor shall any state deprive any person of life, liberty, or property, without due process of law * * *".

Article XI, Sec. 8 of the Constitution of Montana has been heretofore quoted.

The most recent pronouncement of its views in this field by the Supreme Court of the United States is contained in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 decided on May 4, 1970. This case deals with the constitutionality of statutes granting property tax exemptions to religious

organizations for religious properties used solely for religious worship and while we are not here concerned with that problem we do desire to quote from that opinion for its background material. The opinion was written by Mr. Chief Justice Burger and therein it states:

"Prior opinions of this Court have discussed the development and historical background of the First Amendment in detail. See Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). It would therefore serve no useful purpose to review in detail the background of the Establishment and Free Exercise Clauses of the First Amendment or to restate what the Court's opinions have reflected over the years.

*"It is sufficient to note that for the men who wrote the Religious Clauses of the First Amendment the "establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity.* In England, and in some Colonies at the time of the separation in 1776, the Church of England was sponsored and supported by the Crown as a state, or established, church; in other countries 'establishment' meant sponsorship by the sovereign of the Lutheran or Catholic Church. See Engel v. Vitale, 370 U.S., at 428 n. 10, 82 S.Ct. at 1265. See generally C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment (1964). The exclusivity of established churches in the 17th and 18th centuries of course was often carried to prohibition of other forms of worship. See Everson v. Board of Education, 330 U.S., at 9-11, 67 S.Ct., at 508-509; L. Pfeffer, Church, State and Freedom 71 et. seq. (1967).

"The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. In attempting to articulate the scope of the two Religious Clauses, the Court's

opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.

"The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other. For example, in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), Mr. Justice Douglas, writing for the Court noted:

" 'The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State.' Id., at 312, 72 S.Ct. at 683.

" 'We sponsor an attitude on the part of the government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma" Id., at 313, 72 S.Ct. at 685.

"Mr. Justice Harlan expressed something of this in his dissent in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), saying that the constitutional neutrality imposed on us 'is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation." Id., at 422, 83 S.Ct. at 1803.

"The course of constitutional neutrality in this area cannot be absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. *The general principle deductible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion.* Short of those expressly proscribed governmental acts there is room for play in the

joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

"*Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so.* Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.

"Adherents of particular faiths and individual churches frequently take strong positions on public issues including, as this case reveals in the several briefs *amica,* vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts—one which seeks to mark boundaries to avoid excessive entanglement." (Emphasis ours.)

Later in the opinion the Chief Justice wrote:

"Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement. *Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards, but that is not this case.*" (Emphasis ours.)

However, in the instant case this actually is what is comtemplated.

The Chief Justice proceeded to point out the dangers of such a course in these words:

"The hazards of churches supporting government are hardly less in their potential than the hazards of governments supporting churches; each relationship carries some involvement rather than the desired insulation and separation. We cannot ignore the instances in history when church support of government led to the kind of involvement we seek to avoid.

"The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state."

Mr. Justice Douglas in his dissent to the majority opinion calls attention to the fact that:

"It was, for example, not until 1962 that state-sponsored, sectarian prayers were held to violate the Establishment Clause. Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601. That decision brought many protests, for the habit of putting one sect's prayer in public schools had long been practiced. Yet if the Catholics, controlling one school board, could put their prayer into one group of public schools, the Mormons, Baptists, Moslems, Presbyterians, and others could do the same, once they got control *And so the seeds of Establishment would grow and a secular institution would be used to serve a sectarian end.*" (Emphasis ours.)

Since Mr. Justice Douglas has been on the court for more than 30 years, a period in which many cases dealing with the constitutional provisions here under consideration were before the Court, his further observation in his dissent is worthy of quoting:

"With all due respect the governing principle is not controlled by Everson v. Board of Education, supra. Everson involved the use of public funds to bus children to parochial as well as to public schools. Parochial schools teach religion; yet they are also educational institutions offering courses competi-

tive with public schools. They prepare students for the professions and for activities in all walks of life. Education in the secular sense was combined with religious indoctrination at the parochial schools involved in Everson. Even so, the Everson decision was five to four and, though one of the five, I have since had grave doubts about it, because I have become convinced that grants to institutions teaching a sectarian creed violate the Establishment Clause. See Engel v. Vitale, supra, at 443-444, 82 S.Ct. at 1273-1274.''

The foregoing quotations from the Walz opinion express the present views of the United States Supreme Court in the area of separation of church and state as contained in the religious clauses of the First Amendment to our national constitution.

We now turn to our own constitutional provisions to bring this matter to a conclusion. We have quoted various sections thereof previously and we now wish to give detailed consideration to Section 8 of Article XI. This section reads:

''*Neither the legislative assembly, nor any county, city, town, or school district, or other public corporations, shall ever make directly or indirectly, any appropriation, or pay from any public fund or moneys whatever, or make any grant of lands or other property in aid to any church, or for any school, academy, seminary, college, university, or other literary, scientific institution, controlled in whole or in part by any church, sect or denomination whatever.*''  (Emphasis ours.)

As a guide to our discussion we recall the words of this Court in State ex rel. Mills v. Dixon et al, 66 Mont. 76, 213 P. 227:

''This case, like others comprehending constitutional questions of great magnitude, develops much by way of argument which is properly addressed to the people at large, or to a constitutional convention, or, within conceivable limits, to the legislative assembly. As a court dealing with the validity of the enactment after the fact, *our sole consideration is one of law whether the measure is within the provisions of the Constitution of Montana which the people have set over themselves and all their govern-*

*mental agencies. With the wisdom, policy or expediency of the statute we are not concerned.* Godbe v. McCormick, 1 Mont. 105; Jay v. School District, 24 Mont. 219, 61 P. 250." (Emphasis ours.)

Returning to Section 8 of Art. XI, it cannot be asserted that this section is ambiguous or indefinite and thereby open to interpretation since it clearly states in no uncertain terms that no school district can directly or indirectly appropriate or pay from public funds to aid the support of any school controlled in whole or in part by any church, sect or denomination. While it was argued to the contrary by the appellants, that such section could be interpreted to support their theory of this case, we cannot accept such argument.

Anaconda Central High School is a parochial school, owned, operated and controlled by the Roman Catholic Church. The school district has no control over it and even though it complies with the laws with respect to the institution necessary to be given therein under the laws of Montana and regulations of the superintendent of public instruction, it of necessity must supplement these courses of instruction by those required by the doctrines of the Church.

While in the instant case we were not favored with the facts surrounding the purposes and operation of Anaconda Central High School as such, yet we do find from the Roman Catholic Church itself, as set forth in the Encyclical of Pope Pius XI, (Five Great Encyclicals, The Psalmist Press, page 60.)

*"It is necessary that all teaching and the whole organization of the school, and its teachers, syllabus and textbooks in every branch, be regulated by the Christian spirit, under the direction and maternal supervision of the Church;* so that religion may be in very truth the foundation and crown of the youth's entire training; and this in every grade of school, not only the elementary, but the intermediate and the higher institutions of learning as well. To use the words of Leo XIII: 'It is necessary

not only that religious instruction be given to the young at certain fixed times, *but also that every other subject taught, be permeated with Christian piety.'* "

If this is the aim of the Church then if teachers were to be furnished at public expense to a parochial school it would not be possible to determine where the secular purpose ended and the sectarian began.

Thus one could hardly disagree with the following statement of Mr. Justice Jackson in Everson v. Board of Education, 333 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (Oct. 1946).

"'* * * The parochial school is a vital, if not the most vital, part of the Roman Catholic Church. If put to the choice, that venerable institution, I should expect, would forego its whole service for mature persons before it would give up education of the young * * * Catholic education is a rock on which the whole structure rests, and to render tax aid to its Church School is indistinguishable to me from rendering the same aid to the Church itself.''

Finally, we quote from Mr. Justice Douglas in his concurring opinion in School District of Abington Tp. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, wherein he stated:

"The most effective way to establish any institution is to finance it; and this truth is reflected in the appeals by church groups for public funds to finance their religious schools. Financing a church either in its strictly religious activities or in its other activities is equally unconstitutional, as I understand the Establishment Clause. Budgets for one activity may be technically separable from budgets for others. But the institution is an inseparable whole, a living organism, w h i c h is strengthened in proselytizing when it is strengthened in any department by contributions from other than its own members.''

When our late associate, Mr. Justice John W. Bonner, was Attorney General of Montana, he was asked for his opinion as to whether public school moneys could be expended for transportation of a parochial school student.

His opinion No. 228, found in Vol. 19, Opinions of the Attorney General, at page 358, so far as pertinent, reads:

"You have submitted the following questions to this office for opinion:

" '(1) Under the new Transportation Law, may public school moneys, either from the district, county or state, be expended for transportation to a student attending a private or parochial school and  *  *  *

"In answer to your first question you will notice the title of the so-called 'Transportation Act' (Chapter 152 of the Laws of 1941) refers to ' "Transportation" Services for All Public School Pupils Residing Three or More Miles from an Open Public School.' Section 1 of the Act, relating to the power of trustees to furnish transportation, refers to pupils 'who are enrolled in public schools.'  *  *  *

"Section 1053 of the Revised Codes of Montana, 1935, defines 'public school' as follows:

" 'A public school is a school established and maintained under the laws of this state at public expense and comprising the elementary grades, and, when established, the kindergarten and the high school including all the junior and senior grades of high school work.'

"If a child were enrolled in a private or a parochial school he would no longer be a 'public school pupil' within the meaning of the title of Section 1 of the Transportation Act and would not be entitled to transportation or payment in lieu thereof. It is my opinion public school moneys may not be expended to pay transportation to a student attending a private or parochial school. Under Section 8 of Chapter 152 of the Laws of 1941 provision is made for allowing children attending private school to ride on public school buses, provided the parent or guardian pays the proportionate part of such bus transportation. This clearly indicates no public school money is to be spent for private school pupils either directly or indirectly.''

The Transportation Act he refers to is still the law of Montana, being sections 75-3401 to 75-3414, R.C.M.1947. While there have been amendments to the original act in the 29 years since its enactment, none of them change the provisions of the law then Attorney General Bonner discussed and ruled on as above quoted.

In answer to the first issue, we hold that the constitutional provisions of this state prohibit a public school board from making a levy for, or expending funds for the employment of teachers to teach in a parochial school.

As to the second issue, that the issuance of the writ of prohibition operated to deprive the resident students of Deer Lodge County of public educational benefits solely on account of their religion:

The argument is that once the voters of the county resolved to extend these benefits to the students of the parochial school it was not proper for the court to deny the benefits solely on account of the fact the students were enrolled in a parochial school. The school board contends that under the First Amendment to the United States Constitution, reading so far as pertinent:

"Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof* \* \* \*."
and in Sec. 4 of Art. III of our Constitution (heretofore) quoted) the writ of prohibition deprived some students of the "free exercise" of their religion because it denied them educational benefits which the school board had resolved to provide and which the voters had approved.

The respondent answers, and in our opinion correctly, that the school district board acted in violation of section 75-4609 and 75-3801, R.C.M.1947 in adopting the resolution calling for the special levy since these statutes limit such actions to be for the benefit of public schools of the district solely.

There is no question that the parochial school is not a public school and is not a school under the jurisdiction of the school

board. Such being the situation the school board was without statutory authority to proceed as it did, and in doing so it acted in excess of its statutory authority.

The district court was correct in prohibiting the school board from collecting or spending the additional levy for teachers' salaries in the parochial school since such procedure is not permissible under the applicable statutes.

There exists no necessity to further discuss the free exercise clauses in either the United States or Montana Constitutions.

The judgment and order are affirmed.