Justice Laurie McKinnon delivered the Opinion of the Court.
***454 ¶ 1 The Montana Department of Revenue (the Department) appeals from an order of the Eleventh Judicial District Court, Flathead County, granting Kendra Espinoza, Jeri Ellen Anderson, and Jaime Schaefer (collectively, Plaintiffs) summary judgment. The Department is responsible for administering § 15-30-3111, MCA (the Tax Credit Program), which provides a taxpayer a dollar-for-dollar tax credit based on the taxpayer's donation to a Student Scholarship Organization (SSO). SSOs fund tuition scholarships for students who attend private schools meeting the definition of Qualified Education Provider (QEP). The Legislature instructed the Department to implement the Tax Credit Program in compliance with *606 Article V, Section 11(5), and Article X, Section 6, of the Montana Constitution. Pursuant to that grant of authority, the Department implemented Admin. R. M. 42.4.802 (Rule 1), which it believed was necessary to constitutionally administer the Tax Credit Program. Rule 1 adds to the Legislature's definition of QEP and excludes religiously-affiliated private schools from qualifying as QEPs.
¶ 2 Plaintiffs are parents whose children attend a religiously-affiliated private school. Because Rule 1 precludes religiously-affiliated private schools from the definition of QEP, SSOs cannot fund tuition scholarships at the school Plaintiffs' children attend. Plaintiffs filed this proceeding challenging Rule 1. The Department responded, arguing Rule 1 was necessary because the Tax Credit Program as enacted by the Legislature violates Montana's Constitution. The District Court determined the Tax Credit Program was constitutional without Rule 1 and accordingly granted Plaintiffs summary judgment. The Department now appeals, arguing that the Tax Credit Program is unconstitutional absent Rule 1. We address the following issue on appeal:
Does the Tax Credit Program violate Article X, Section 6, of the Montana Constitution ?
¶ 3 We conclude the Tax Credit Program violates Article X, Section 6, of the Montana Constitution and accordingly reverse the ***455 District Court's order granting Plaintiffs summary judgment.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 4 In 2015, the Legislature, through Senate Bill 410, enacted Title 15, chapter 30, part 31, MCA, entitled "Tax Credit for Qualified Education Contributions." Sections 15-30-3101 to -3114, MCA (Part 31); 2015 Mont. Laws 2165. Part 31 provides two types of dollar-for-dollar tax credits to taxpayers who donate to educational programs in Montana. Sections 15-30-3110 to -3111, MCA. A taxpayer may receive a tax credit for providing supplemental funding to public schools, § 15-30-3110, MCA, or for donating to the Tax Credit Program, § 15-30-3111, MCA. The only tax credit at issue in these proceedings is the credit a taxpayer receives based on her donation to the Tax Credit Program, § 15-30-3111, MCA.[1] The Tax Credit Program provides a taxpayer a dollar-for-dollar tax credit of up to $150 based on her donation to an SSO. Section 15-30-3111(1), MCA.
¶ 5 An SSO is a charitable organization in Montana that is (1) "exempt from federal income taxation under [ I.R.C. § 501(c)(3) ]"; (2) "allocates not less than 90% of its annual revenue for scholarships to allow students to enroll with any [QEP]"; and (3) "provides educational scholarships to eligible students without limiting student access to only one education provider." Section 15-30-3102(9)(a)-(c), MCA ; see also § 15-30-3103, MCA (listing additional SSO requirements); §§ 15-30-3105 to -3106, MCA (setting forth SSO reporting requirements). The purpose of SSOs "is to provide parental and student choice in education with private contributions through tax replacement programs." Section 15-30-3101, MCA.
¶ 6 Taxpayer donors donate to SSOs generally; they "may not direct or designate contributions to a parent, legal guardian, or specific [QEP]." Section 15-30-3111(1), MCA. SSOs then use those donations to fund student tuition scholarships at private schools meeting the definition of QEP in § 15-30-3102(7), MCA. Section 15-30-3104(1), MCA. SSOs are responsible for maintaining "an application process under which scholarship applications are accepted, reviewed, approved, ***456 and denied." Section 15-30-3103(1)(h), MCA. After an SSO decides to grant a student a tuition scholarship, the SSO pays the scholarship directly to the scholarship recipient's QEP. Section 15-30-3104(1), MCA. The Legislature defined QEP as "an education provider that":
*607 (a) is not a public school;
(b) (i) is accredited, has applied for accreditation, or is provisionally accredited by a state, regional, or national accreditation organization; or
(ii) is a nonaccredited provider or tutor and has informed the child's parents or legal guardian in writing at the time of enrollment that the provider is not accredited and is not seeking accreditation;
(c) is not a home school as referred to in 20-5-102(2)(e);
(d) administers a nationally recognized standardized assessment test or criterion-referenced test and:
(i) makes the results available to the child's parents or legal guardian; and
(ii) administers the test for all 8th grade and 11th grade students and provides the overall scores on a publicly accessible private website or provides the composite results of the test to the office of public instruction for posting on its website;
(e) satisfies the health and safety requirements prescribed by law for private schools in this state; and
(f) qualifies for an exemption from compulsory enrollment under 20-5-102(2)(e) and 20-5-109.
Section 15-30-3102(7), MCA. Essentially, the Legislature's definition of QEP means "a private school."
¶ 7 The Department is responsible for implementing and administering Part 31. Sections 15-30-3102(1), -3114, MCA. The Department must perform extensive administrative tasks to ensure Part 31 functions appropriately. Sections 15-30-3103, -3105, -3111 to -3113, MCA. The Legislature explicitly granted the Department rulemaking authority to "adopt rules, prepare forms, and maintain records that are necessary to implement and administer [Part 31]." Section 15-30-3114, MCA. The Legislature also instructed the Department to administer Part 31 in compliance with Article V, Section 11(5), and Article X, Section 6, of the Montana Constitution. Section 15-30-3101, MCA.
¶ 8 Beginning in fiscal year 2016, to accomplish these statutorily-mandated responsibilities, the Department required additional resources and personnel. Senate Bill 410's Fiscal Note estimated one-time costs to the Department of $420,325 to develop new ***457 forms and add data processing systems. S. 410 Fiscal Note, 64th Reg. Sess., at 3 (April 21, 2015), https://perma.cc/6X7Z-GEEZ (hereinafter Fiscal Note). Further, the Department required two additional full-time employees: one to process and verify credit applications and annual reports from SSOs and another to verify and audit the new tax credits. Fiscal Note, at 3-4.
¶ 9 Tasked with constitutionally implementing Part 31, the Department identified what it saw as a constitutional deficiency: the Tax Credit Program aided sectarian schools in violation of Article X, Section 6, of Montana's Constitution. Under the Legislature's definition of QEP, most QEPs were religiously-affiliated private schools. The Department examined how the Tax Credit Program operated and determined it unconstitutionally aided those religiously-affiliated QEPs. To combat the issue, and pursuant to the rulemaking authority granted by the Legislature, §§ 15-30-3101, -3114, MCA, the Department adopted Rule 1.
¶ 10 Rule 1 added to the Legislature's definition of QEP, § 15-30-3102(7), MCA, providing:
(1) A "qualified education provider" has the meaning given in 15-30-3102, MCA, and pursuant to 15-30-3101, MCA, may not be:
(a) a church, school, academy, seminary, college, university, literary or scientific institution, or any other sectarian institution owned or controlled in whole or in part by any church, religious sect, or denomination; or
(b) an individual who is employed by a church, school, academy, seminary, college, university, literary or scientific institution, or any other sectarian institution owned or controlled in whole or in part by any church, religious sect, or denomination when providing those services.
(2) For the purposes of (1), "controlled in whole or in part by a church, religious sect, or denomination" includes accreditation by a faith-based organization.
*608 Admin. R. M. 42.4.802. Simply put, Rule 1 excluded religiously-affiliated private schools from the Legislature's definition of QEP, § 15-30-3102(7), MCA.
¶ 11 Plaintiffs are parents whose children attend a religiously-affiliated private school in Montana. The school qualifies as a QEP under the Legislature's definition, § 15-30-3102(7), MCA, but does not qualify as a QEP under the Department's definition, Rule 1. Plaintiffs challenged Rule 1 in District Court, arguing it violated the free exercise clauses of ***458 the Montana and U.S. Constitution.[2] Plaintiffs further reasoned that Rule 1 was unnecessary because the Tax Credit Program and the Legislature's definition of QEP were constitutional. The Department responded, arguing that the Tax Credit Program is unconstitutional and reasoning that Rule 1 necessarily restricted the Tax Credit Program which, absent Rule 1, aided sectarian schools. Both sides filed cross-motions for summary judgment.
¶ 12 The District Court narrowly focused its analysis on the tax credits themselves, noting the credits did not "involve the expenditure of money that the state has in its treasury." Instead, it determined the tax credits "concern[ed] money that is not in the treasury and not subject to expenditure." For that reason alone, the District Court concluded the Department incorrectly interpreted Article V, Section 11(5), and Article X, Section 6(1), of the Montana Constitution. Because it decided the Tax Credit Program was constitutional as enacted by the 2015 Legislature, the District Court did not further address Rule 1's constitutionality. The District Court granted Plaintiffs' motion for summary judgment, denied the Department's motion for summary judgment, and permanently enjoined the Department from applying or enforcing Rule 1. The Tax Credit Program remained as enacted by the 2015 Legislature. The Department now appeals the District Court's decision.
STANDARD OF REVIEW
¶ 13 This Court exercises plenary review over constitutional law questions. Nelson v. City of Billings , 2018 MT 36, ¶ 8, 390 Mont. 290, 412 P.3d 1058. A statute is presumed constitutional unless it "conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt." Gazelka v. St. Peter's Hosp. , 2018 MT 152, ¶ 6, 392 Mont. 1, 420 P.3d 528 (quoting Powell v. State Comp. Ins. Fund , 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877 ). The party challenging the constitutionality of the statute bears the burden of proof. Mont. Cannabis Indus. Ass'n v. State , 2016 MT 44, ¶ 12, 382 Mont. 256, 368 P.3d 1131. If any doubt exists, it must be resolved in favor of the ***459 statute. Mont. Cannabis Indus. Ass'n , ¶ 12.
¶ 14 Whether an administrative rule impermissibly conflicts with a statute is a question of law to be decided by the court. Clark Fork Coal. v. Tubbs , 2016 MT 229, ¶ 18, 384 Mont. 503, 380 P.3d 771 ; Gold Creek Cellular of Mont. L.P. v. State , 2013 MT 273, ¶ 9, 372 Mont. 71, 310 P.3d 533. We review a district court's conclusions of law to determine if they are correct. Clark Fork , ¶ 18.
DISCUSSION
¶ 15 The First Amendment's Religion Clauses-the Establishment Clause and the Free Exercise Clause-are "frequently in tension." Locke v. Davey , 540 U.S. 712, 718, 124 S.Ct. 1307, 1311, 158 L.Ed.2d 1 (2004). Yet, "there is room for play in the joints" between them. Walz v. Tax Comm'n of N.Y. , 397 U.S. 664, 669, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970). A state's constitutional prohibition against aid to sectarian schools may be broader and stronger than the First Amendment's prohibition against the establishment of religion. See Locke , 540 U.S. at 722, 124 S.Ct. at 1313. Where a state's constitution "draws a more stringent line than that drawn by the United States Constitution,"
*609 the "room for play" between the Establishment and Free Exercise Clauses narrows. See Locke , 540 U.S. at 718, 722, 124 S.Ct. at 1311, 1313. The Montana Constitution broadly and strongly prohibits state aid to sectarian schools, leaving a very limited amount of "room for play." See Mont. Const. art. X, § 6 (hereinafter, Article X, Section 6 ).
¶ 16 Our analysis, therefore, considers Article X, Section 6, within a narrower "room for play" between the federal Religion Clauses and, consequently, we do not address federal precedent. We conclude that Montana's Constitution more broadly prohibits "any" state aid to sectarian schools and draws a "more stringent line than that drawn" by its federal counterpart. See Locke , 540 U.S. at 722, 124 S.Ct. at 1313. Therefore, the sole issue in this case is whether the Tax Credit Program runs afoul of Montana's specific sectarian education no-aid provision, Article X, Section 6. For the following reasons, we conclude the Tax Credit Program aids sectarian schools in violation of Article X, Section 6.
I. Article X, Section 6, broadly and strictly prohibits aid to sectarian schools.
¶ 17 Article X, Section 6, of the Montana Constitution, entitled "Aid prohibited to sectarian schools," provides:
(1) The legislature, counties, cities, towns, school districts, and public corporations shall not make any direct or indirect appropriation or payment from any public fund or monies, or any ***460 grant of lands or other property for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination.
(2) This section shall not apply to funds from federal sources provided to the state for the express purpose of distribution to non-public education.
¶ 18 The Constitutional Convention Delegates' (Delegates) intent controls our interpretation of a constitutional provision. Nelson , ¶ 14. We primarily discern the Delegates' intent "from the plain meaning of the language used." Nelson , ¶ 14 (explaining that we apply our rules of statutory construction to our analysis of constitutional provisions). However, we define the Delegates' intent "not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the [Delegates] drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve." Nelson , ¶ 14. Accordingly, we "determine the meaning and intent of constitutional provisions from the plain meaning of the language used without resort to extrinsic aids except when the language is vague or ambiguous or extrinsic aids clearly manifest an intent not apparent from the express language." Nelson , ¶ 16 (emphasis added).
¶ 19 In determining what the Delegates intended Article X, Section 6, to mean, we first observe that the plain language of the provision's title is expansive and forceful: "Aid prohibited to sectarian schools." The title clearly manifests the Delegates' intent to broadly prohibit aid to sectarian schools. The provision's text is equally expansive, prohibiting numerous types of state actors, including the "legislature, counties, cities, towns, school districts, and public corporations" from making "any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any ... school ... controlled in whole or in part by any church, sect, or denomination." Mont. Const. art. X, § 6 (1).
¶ 20 The provision's plain language begs three main inquiries, each of which cast a broad net clearly intended to prohibit "any" type of state aid being used to benefit sectarian education. First, the provision's plain language identifies the entity that is prohibited from providing the aid: Article X, Section 6, prohibits the "legislature, counties, cities, towns, school districts, and public corporations" from aiding sectarian schools. Second, the provision's plain language identifies the type of aid it prohibits: Article X, Section 6, broadly prohibits any type of direct or indirect aid to sectarian schools-"any direct or indirect appropriation ***461 or payment from any *610 public fund or monies, or any grant of lands or other property." Third, the provision's plain language specifies that the aid is prohibited "for any sectarian purpose or to aid any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination."
¶ 21 The Delegates adapted Article X, Section 6, of the Montana Constitution from the 1889 Constitution's broad and general no-aid provision, recognizing that it was already "among the most stringent [no-aid clauses] in the nation." Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, pp. 2008, 2011 (hereinafter Convention Transcript); see Mont. Const. of 1889, art. XI, § 8 ("[T]he Legislative Assembly ... shall [n]ever make directly or indirectly, any appropriation, or pay from any public fund or moneys ... in aid of any church, or for any sectarian purpose, or to aid in the support of any school ... controlled in whole or in part by any church....").
¶ 22 The Delegates' strong commitment to maintaining public education and ensuring that public education remained free from religious entanglement is evident from the Constitutional Convention Transcripts; the Delegates wanted the public school system to receive "unequivocal support." Convention Transcript, p. 2008. Delegate Burkhardt noted, "Under federal and state mandates to concentrate public funds in public schools, our educational system has grown strong in an atmosphere free from divisiveness and fragmentation." Convention Transcript, p. 2009. He further emphasized, "Any diversion of funds or effort from the public school system would tend to weaken that system in favor of schools established for private or religious purposes." Convention Transcript, p. 2009 (emphasis added).
¶ 23 A minority of Delegates sought to delete the language prohibiting indirect aid from Article X, Section 6. Those Delegates wanted to ensure private school students could receive federal aid under the United States Supreme Court's child-benefit theory, which allows federal aid as long as it directly supports the child and not the religious school. Convention Transcript, pp. 2010-11. Delegate Blaylock, however, expressed concern that deleting the indirect language would make it "fairly easy to appropriate a number of funds ... to some other group and then say this will be done indirectly." Convention Transcript, p. 2015. The Delegates ultimately maintained the indirect language and instead added a separate subsection specifically addressing federal aid: "[ Article X, Section 6 ] shall not apply to funds from federal sources provided to the state for the express purpose of distribution to non-public education."
***462 Mont. Const. art. X, § 6 (2). Notably, the Delegates understood that Montana could prohibit forms of state aid that were otherwise permissible as federal aid. Convention Transcript, pp. 2008, 2011, 2024-25. Our conclusion that Article X, Section 6, more broadly prohibits aid to sectarian schools than the federal Establishment Clause is consistent with the Delegates' intent of the provision.
¶ 24 It is also worth observing that Montana's no-aid provision is unique from other states' no-aid provisions. Article X, Section 6 's prohibition of "any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property for any sectarian purpose or to aid any ... school ... controlled in whole or in part by any church" make it a broader and stronger prohibition against aid to sectarian schools than other states.[3] Even other states whose no-aid provisions also contain "indirect" language only prohibit aid in the form of the direct or indirect taking of money from the public treasury. See Ga. Const. art. I, § II, ¶ VII ("No money shall ever be taken from the public treasury, directly or indirectly, *611 in aid of any church....");[4] Fla. Const. art. I, § 3 ("No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church....").[5] Such language is distinct from and less stringent than Montana's prohibition on any type of aid, whether it be a "direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property." Mont. Const. art. X, § 6 (1). ***463 ¶ 25 As a Court, we have not yet interpreted Article X, Section 6. However, the 1972 Constitutional Convention Delegates intended Article X, Section 6, to retain the meaning of Article XI, Section 8, of the Montana Constitution of 1889. See Convention Transcript, p. 2014. Accordingly, this Court's pre-1972 precedent analyzing Article XI, Section 8, of the Montana Constitution of 1889 remains helpful to our analysis of Article X, Section 6. In State ex rel. Chambers v. School Dist. No. 10 , 155 Mont. 422, 436-41, 472 P.2d 1013, 1020-22 (1970), the Court considered whether a tax levy intended to fund general teaching positions at a religiously-affiliated private school violated Article XI, Section 8, of the Montana Constitution of 1889. The Court observed that the tax levy permitted a religiously-affiliated school to unconstitutionally obtain teachers at public expense. Chambers , 155 Mont. at 437-38, 472 P.2d at 1020-21. Even though the teachers would have taught general, secular subjects, the Court noted that the funding nonetheless aided sectarian schools, as there was no way to determine "where the secular purpose ended and the sectarian began." Chambers , 155 Mont. at 438, 472 P.2d at 1021. Accordingly, the Court determined Article XI, Section 8, of the Montana Constitution of 1889 prohibited "a public school board from making a levy for, or expending funds for the employment of teachers to teach in a parochial school." Chambers , 155 Mont. at 440, 472 P.2d at 1022.
¶ 26 The plain language of Article X, Section 6, and the Constitutional Convention Transcripts demonstrating the Delegates' clear objective to firmly prohibit aid to sectarian schools lead us to the conclusion that the Delegates intended Article X, Section 6, to broadly and strictly prohibit aid to sectarian schools.
II. The Tax Credit Program aids sectarian schools in violation of Article X, Section 6, of the Montana Constitution.
¶ 27 Plaintiffs initially filed this action challenging Rule 1. The District Court focused its analysis on the underlying Tax Credit Program, determining the program itself was constitutional. Therefore, the District Court easily dispelled of Rule 1 after concluding it was based on a mistake of law. On appeal, the Department argues that the Tax Credit Program is unconstitutional and, accordingly, Rule 1 is necessary for the Department to constitutionally administer the program.[6] To properly evaluate the propriety of Rule 1, we must first ***464 address the Department's contention that the Tax Credit Program is unconstitutional. It is clear the Department's contention is a facial challenge to the Tax Credit Program, as it asserts the Tax Credit Program unconstitutionally aids sectarian schools and promulgated Rule 1 to cure the constitutional defect. Under *612 United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), a party bringing a facial challenge must "establish that no set of circumstances exists under which the [statute] would be valid"-that is, that the law is unconstitutional in all of its applications. See also Mont. Cannabis Indus. Ass'n , ¶ 14.
¶ 28 To analyze the Tax Credit Program under Article X, Section 6, first, we identify the entity providing the aid; second, we identify the type of aid; and third, we consider whether the entity provided the aid "for any sectarian purpose or to aid any ... school ... controlled in whole or in part by any church...." We ultimately conclude the Tax Credit Program aids sectarian schools in violation of Article X, Section 6, and that it is unconstitutional in all of its applications.
a. The Legislature aided sectarian schools when it enacted the Tax Credit Program.
¶ 29 Article X, Section 6, directly prohibits various entities, including the Legislature, from aiding sectarian schools. Preliminarily, we recognize that an individual taxpayer may give money to any cause she wishes. A taxpayer is free to donate to an SSO, a QEP, or any other charitable cause of her choice. There is no prohibition on a taxpayer giving her money away, nor would such prohibition be constitutional.
¶ 30 In this case, the action under scrutiny is the Legislature's provision of a tax credit to taxpayer donors. The Legislature, by enacting the Tax Credit Program, involved itself in donations to religiously-affiliated private schools. The Tax Credit Program provides a dollar-for-dollar incentive of up to $150 for taxpayer donations to SSOs. The tax credit encourages the transfer of money from a taxpayer donor to a sectarian school because the taxpayer donor knows she will be reimbursed, dollar-for-dollar, for her donation to an SSO. SSOs, in turn, directly fund tuition scholarships at religiously-affiliated QEPs. The Legislature, by enacting a statute that provides a dollar-for-dollar credit against taxes owed to the state, is the entity providing aid to sectarian schools via tax credits in violation of Article X, Section 6.
b. The Tax Credit Program permits the Legislature to indirectly ***465 pay tuition at private, religiously-affiliated schools.
¶ 31 Article X, Section 6, broadly prohibits any type of direct or indirect aid: the Legislature may not make "any direct or indirect appropriation or payment from any public fund or monies, or any grant of lands or other property."
¶ 32 The Tax Credit Program permits the Legislature to indirectly pay tuition at private, religiously-affiliated schools. Parents owe a certain amount of tuition to the QEP their child attends. If a child receives a tuition scholarship from an SSO, the scholarship decreases the amount of tuition that child's parents owe to the QEP. Many of the taxpayer donors who would donate to SSOs would be parents of children who attend QEPs. When parents donate to an SSO, they receive a dollar-for-dollar tax credit of up to $150. If the parents' child also receives a tuition scholarship from an SSO in the amount of, for example, $150, the parents' tuition obligation to the QEP decreases by $150-the exact amount the parents received as a tax credit for their donation to an SSO. The parents donated $150 to an SSO, received a dollar-for-dollar reimbursement for that donation in the form of a tax credit, and subsequently owed $150 less in tuition to their child's QEP. The Legislature indirectly payed $150 of that student's tuition by permitting his or her parents to claim a tax credit instead of paying that amount of tuition to the QEP.
¶ 33 The Legislature attempted to sever the indirect payment by requiring taxpayer donors to donate to an SSO generally and prohibiting them from directing or designating contributions to specific parents, legal guardians, or QEPs. See § 15-30-3111(1), MCA. Therefore, parents cannot donate to an SSO, claim a tax credit for their donation, and then directly designate the funds they donated to their own child's scholarship. However, an indirect payment still exists, as described above, when a student whose parents claimed the tax credit receives a scholarship *613 from an SSO. The simple fact that parents who donate to SSOs cannot directly designate the scholarship funds to their own child or to their child's school does not defeat the fact that the Legislature indirectly pays tuition to the QEP. Senate Bill 410's Fiscal Note recognized as much, stating that the donations to SSOs, the bases for the tax credits, "would primarily represent funds that would have been used to pay tuition directly ...." Fiscal Note, at 2. The Tax Credit Program permits the Legislature to indirectly pay tuition at QEPs by reimbursing parents for donating to SSOs, donations funded with money the parents would have otherwise used to pay their child's tuition.
¶ 34 The Tax Credit Program permits the Legislature to subsidize ***466 tuition payments at religiously-affiliated private schools. A subsidy is a "grant , usu[ally] made by the government, to any enterprise whose promotion is considered to be in the public interest." Subsidy , Black's Law Dictionary (10th ed. 2014). "Although governments sometimes make direct payments (such as cash grants), subsidies are usu[ally] indirect. They may take the form of ... tax breaks...." Subsidy , Black's Law Dictionary (10th ed. 2014). When the Legislature indirectly pays general tuition payments at sectarian schools, the Legislature effectively subsidizes the sectarian school's educational program. That type of government subsidy in aid of sectarian schools is precisely what the Delegates intended Article X, Section 6, to prohibit.
¶ 35 While $150 may seem like a small sum of money when compared to the State's overall operating budget, the amount of aid is wholly insignificant to an Article X, Section 6, analysis. The Legislature violates Article X, Section 6 's prohibition on aid to sectarian schools when it provides any aid, no matter how small. Further, the $150 indirect payments certainly add up over time, especially as the aggregate limits on the tax credits increase from $3 million each year the limit is met. See § 15-30-3111(5)(a)(i)-(iii), MCA. The Tax Credit Program creates an indirect payment: the program reduces "the net price of attending private school ... for students who receive scholarships and whose families claim the credit." Fiscal Note, at 2. Article X, Section 6, expressly prohibits that type of indirect payment to sectarian schools.
¶ 36 Importantly, for purposes of examining the facial constitutionality of the Tax Credit Program, the schools meeting the Legislature's definition of QEP may be-and, in fact, the overwhelming majority are-religiously affiliated. There is simply no mechanism within the Tax Credit Program itself that operates to ensure that an indirect payment of $150 is not used to fund religious education in contravention of Article X, Section 6. The Department, in administering the Tax Credit Program pursuant to the Legislature's definition of QEP, § 15-30-3102(7), MCA, has no ability to ensure that indirect payments are not made to religious schools. Or, as this Court has previously cautioned, there is no mechanism within the Tax Credit Program to identify "where the secular purpose end[s] and the sectarian beg[ins]." Chambers , 155 Mont. at 438, 472 P.2d at 1021. The Department cannot discern when the tax credit is indirectly paying tuition at a secular school and when the tax credit is indirectly paying tuition at a sectarian school. Because the Tax Credit Program does not distinguish between an indirect payment to fund a secular education and an indirect payment to fund a sectarian education, it cannot, under ***467 any circumstance, be construed as consistent with Article X, Section 6.
c. The Legislature provided the tax credits to aid schools controlled in whole or in part by churches.
¶ 37 Article X, Section 6, prohibits aid used "for any sectarian purpose or to aid any ... school ... controlled in whole or in part by any church, sect, or denomination." In Chambers , we explained that public funds could not be used to pay teachers' salaries at a religiously-affiliated private school, even if those teachers provided standard, non-religious instruction. Chambers , 155 Mont. at 438, 472 P.2d at 1021. In support of that conclusion, we reasoned that the school was sectarian as a whole, and therefore there was no way to determine "where the secular purpose ended and the sectarian began." Chambers , 155 Mont. at 438, 472 P.2d at 1021.
*614 ¶ 38 Under the Legislature's definition of QEP, the majority of QEPs are private schools controlled by churches. SSOs pay scholarship funds directly to QEPs and the funds offset scholarship recipients' general tuition obligations. General tuition payments fund the sectarian school as a whole and therefore may be used by the school to strengthen any aspect of religious education, including those areas heavily entrenched in religious doctrine. Religious education is a "rock on which the whole [church] rests, and to render tax aid to [a religious school] is indistinguishable ... from rendering the same aid to the [c]hurch itself." Chambers , 155 Mont. at 438, 472 P.2d at 1021 (quoting Everson v. Bd. of Educ. , 330 U.S. 1, 24, 67 S.Ct. 504, 515, 91 L.Ed. 711 (1947) (Jackson, J., dissenting) ). The Tax Credit Program aids schools controlled by churches, in violation of Article X, Section 6.
¶ 39 "The most effective way to establish any institution is to finance it." Chambers , 155 Mont. at 438, 472 P.2d at 1021 (quoting Sch. Dist. of Abington Twp. v. Schempp , 374 U.S. 203, 229, 83 S.Ct. 1560, 1575, 10 L.Ed.2d 844 (1963) (Douglas, J., concurring) ). The Legislature's enactment of the Tax Credit Program is facially unconstitutional and violates Montana's constitutional guarantee to all Montanans that their government will not use state funds to aid religious schools. This basic notion of separation of church and state is a foundation of our Nation's federal Constitution, but is more fiercely protected by Montanans through the broader prohibitions contained in Article X, Section 6. Although the Tax Credit Program provides a mechanism of attenuating the tax credit from the SSO's tuition payment to a religiously-affiliated QEP, it does not comport with the constitutional prohibition on indirectly aiding sectarian schools. We conclude, following consideration of both the plain language of the provision and the Delegates' intent as discerned from their discussion when drafting ***468 Montana's 1972 Constitution, that such attenuation remains inconsistent with Article X, Section 6 's strict and broad prohibition on aid to sectarian schools. The Tax Credit Program constitutes the precise type of indirect payment the Delegates sought to prohibit in their formulation of Article X, Section 6. Based on the Legislature's definition of QEP, the Department cannot constitutionally implement or administer the Tax Credit Program. Because Senate Bill 410 contained a severability clause,[7] we conclude the Tax Credit Program, § 15-30-3111, MCA, must be severed from the remainder of Part 31, §§ 15-30-3101 to -3114, MCA.
¶ 40 Having concluded the Tax Credit Program violates Article X, Section 6, it is not necessary to consider federal precedent interpreting the First Amendment's less-restrictive Establishment Clause. Conversely, however, an overly-broad analysis of Article X, Section 6, could implicate free exercise concerns. Although there may be a case where an indirect payment constitutes "aid" under Article X, Section 6, but where prohibiting the aid would violate the Free Exercise Clause, this is not one of those cases. We recognize we can only close the "room for play" between the joints of the Establishment and Free Exercise Clauses to a certain extent before our interpretation of one violates the other.
III. Rule 1 is unnecessary because the underlying Tax Credit Program is unconstitutional and, further, the Department exceeded its rulemaking authority when it enacted Rule 1.
¶ 41 The Department enacted Rule 1 in its efforts to constitutionally implement the Tax Credit Program, which we have now determined is unconstitutional. We severed the Tax Credit Program from the remainder of Part 31. See supra , ¶39. As a result, Rule 1 is superfluous. However, we further note that, in enacting Rule 1, the Department exceeded the Legislature's grant of rulemaking authority. See § 15-30-3114, MCA (granting the Department rulemaking authority to *615 adopt rules that are necessary to implement and administer Part 31).
¶ 42 An agency's authority to adopt rules is limited:
Whenever by the express or implied terms of any statute a state agency has authority to adopt rules to implement, interpret, make specific, or otherwise carry out the provisions of the statute, an ***469 adoption, amendment, or repeal of a rule is not valid or effective unless it is:
(a) consistent and not in conflict with the statute; and
(b) reasonably necessary to effectuate the purpose of the statute.
Section 2-4-305(6), MCA ; see also Bd. of Barbers of Dep't of Prof'l & Occupational Licensing v. Big Sky College of Barber-Styling , 192 Mont. 159, 161, 626 P.2d 1269, 1271 (1981). Accordingly, the Department's rules implementing Part 31 needed to be (1) consistent and not in conflict with Part 31 and (2) reasonably necessary to effectuate the purpose of Part 31. See § 2-4-305(6), MCA.
¶ 43 Rule 1 is inconsistent with the Legislature's definition of QEP. The Legislature broadly defined QEP to include all private schools in Montana, including religiously-affiliated schools. Section 15-30-3102(7), MCA. The Department's Rule 1 significantly narrowed the scope of the schools qualifying as QEPs, excluding all schools controlled in whole or in party by any church. Admin. R. M. 42.4.802. The Department's limitation on the definition of QEP conflicts with the Legislature's broad definition.
¶ 44 Although we recognize that the Legislature, by enacting § 15-30-3101, MCA, granted the Department broad authority to implement Part 31 consistent with Article X, Section 6, an agency may only adopt rules to "implement, interpret, make specific, or otherwise carry out the provisions of [a] statute." Section 2-4-305(6), MCA. An agency cannot transform an unconstitutional statute into a constitutional statute with an administrative rule. It is the Legislature's responsibility to craft statutes in compliance with Montana's Constitution, which it failed to do here. Rule 1 is superfluous because the underlying Tax Credit Program is unconstitutional and, additionally, the Department exceeded the Legislature's grant of rulemaking authority in enacting Rule 1.
CONCLUSION
¶ 45 We conclude the Tax Credit Program violates Article X, Section 6 's stringent prohibition on aid to sectarian schools. Because the Tax Credit Program is unconstitutional, Rule 1 is superfluous and, further, the Department exceeded the scope of its rulemaking authority when it enacted Rule 1. We accordingly reverse the District Court's order granting Plaintiffs summary judgment and determine the Tax Credit Program, § 15-30-3111, MCA, must be severed from the remainder of Part 31, §§ 15-30-3101 to -3114, MCA.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.

The Legislature capped the Tax Credit Program's aggregate total of tax credits to $3 million in tax year 2016. Section 15-30-3111(5)(a)(i), MCA ; see also § 15-30-3110(5)(a)(i) (setting forth an identical aggregate $3 million cap for tax credits based on taxpayer contributions to public schools). If the aggregate limit is met in any given tax year, the subsequent year's limit increases. Section 15-30-3111(5)(a)(ii)-(iii), MCA ; see also § 15-30-3110(5)(a)(ii)-(iii) (creating the same increase for contributions to public schools).

On December 24, 2015, Plaintiffs filed a "Notice of Constitutional Challenge to a Statute" in District Court which notified the Attorney General that they filed a complaint alleging that the Tax Credit Program "as interpreted and applied by the Department of Revenue in its 'Rule 1' ... violates" Article II, Sections 4 and 5, of the Montana Constitution. Thereafter, and throughout this litigation, counsel for the Department has appeared and represented themselves as "Special Assistant Attorneys General."

See, e.g. , Utah Const. art. X, § 9 ("Neither the state of Utah nor its political subdivisions may make any appropriation for the direct support of any school or educational institution controlled by any religious organization."); Del. Const. art. X, § 3 ("No portion of any fund now existing, or which may hereafter be appropriated, or raised by tax, for educational purposes, shall be appropriated to, or used by, or in aid of any sectarian, church or denominational school[.]"); Ala. Const. art. XIV, § 263 ("No money raised for the support of the public schools shall be appropriated to or used for the support of any sectarian or denominational school.").

In Gaddy v. Ga. Dep't of Revenue , 301 Ga. 552, 802 S.E.2d 225, 230 (2017), the Georgia Supreme Court upheld a similar tax-credit program.

In McCall v. Scott , 199 So.3d 359, 370 (Fla. Dist. Ct. App. 2016), cert. denied , No. SC16-1668, 2017 WL 192043, at *1, 2017 Fla. LEXIS 83, at *1 (Fla. 2017), a Florida Court of Appeals concluded that the "express language of Florida's no-aid provision contains no limit on the Legislature's taxing authority, including the Legislature's power to enact laws creating tax credits or exceptions; rather, th[e] provision focuses on the use of state funds to aid sectarian institutions, not other kinds of support." (Internal citation and quotations omitted.)

As it did before the District Court, the Department's own attorneys have acted as Special Assistant Attorneys General on appeal. M. R. App. P. 27 provides that a party challenging the constitutionality of any act of the Montana Legislature in this Court must provide the attorney general with notice of the constitutional issue, but only if neither the state nor any state agency is a party to the proceeding. The Department of Revenue, a state agency, is the defendant in this case and, accordingly, a notice of the constitutional challenge was not mandated.

2015 Mont. Laws 2186 ("If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.").