Justice GORSUCH, concurring.
The people of Montana, acting through their legislature, adopted a school choice program. It provided a modest tax credit to individuals and businesses who donated to nonprofit scholarship organizations. As the program began to take root, Montana had just one scholarship organization. It granted scholarships to families who were struggling financially or had children with disabilities. Recipients were free to use the scholarships at the schools of their choice. Some families chose secular schools, others religious ones.
Kendra Espinoza, the lead petitioner in this case, is a single mother who works three jobs. She planned to use scholarships to help keep her daughters at an accredited religious school. That is, until the Montana Supreme Court struck down the tax credit program. Those seeking a tax credit were free to choose whether to direct their donations to the independent scholarship organization; the organization was then free to choose scholarship recipients; and, *2275 after that, parents were free to choose where to use those scholarships. But, the Montana Supreme Court held, this arrangement impermissibly allowed state funds to find their way to religious schools, in violation of a state constitutional provision. By way of remedy, the court ordered an end to the tax credit program, effectively killing Montana's school choice experiment: Without tax credits, donations dry up, and so do the scholarships enabling school choice.
Today, the Court explains how the Montana Constitution, as interpreted by the State Supreme Court, violates the First Amendment by discriminating against parents and schools based on their religious status or identity. The Court explains, too, why the State Supreme Court's decision to eliminate the tax credit program fails to mask the discrimination. But for the Montana Constitution's impermissible discrimination, after all, the legislature's tax credit and scholarship program would be still operating for the benefit of Ms. Espinoza and everyone else. I agree with all the Court says on these scores and join its opinion in full. I write separately only to address an additional point.
The Court characterizes the Montana Constitution as discriminating against parents and schools based on "religious status and not religious use." Ante, at 2256. No doubt, the Court proceeds as it does to underscore how the outcome of this case follows from Trinity Lutheran Church of Columbia, Inc. v. Comer , 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), where the Court struck down a similar public benefits restriction that, it held, discriminated on the basis of religious status. No doubt, too, discrimination on the basis of religious status raises grave constitutional questions for the reasons the Court describes. But I was not sure about characterizing the State's discrimination in Trinity Lutheran as focused only on religious status, and I am even less sure about characterizing the State's discrimination here that way. See id., at ---- - ----, 137 S.Ct., at 2025-2026 (GORSUCH, J., concurring in part).
In the first place, discussion of religious activity, uses, and conduct-not just status-pervades this record. The Montana Constitution forbids the use of public funds "for any sectarian purpose," including to "aid" sectarian schools. Art. X, § 6(1). Tracking this directive, the State Supreme Court reasoned that the legislature's tax credit program could be used to "subsidiz[e] the sectarian school's educational program" and thereby "strengthen ... religious education." 393 Mont. 446, 466, 467, 435 P.3d 603, 613, 614 (2018). Meanwhile, Ms. Espinoza admits that she would like to use scholarship funds to enable her daughters to be taught in school the "same Christian values" they are taught at home. App. to Pet. for Cert. 152. Finally, in its briefing before this Court, Montana has represented that its Constitution focuses on preventing the use of tax credits to subsidize religious activity.
Not only is the record replete with discussion of activities, uses, and conduct, any jurisprudence grounded on a status-use distinction seems destined to yield more questions than answers. Does Montana seek to prevent religious parents and schools from participating in a public benefits program (status)? Or does the State aim to bar public benefits from being employed to support religious education (use)? Maybe it's possible to describe what happened here as status-based discrimination. But it seems equally, and maybe more, natural to say that the State's discrimination focused on what religious parents and schools do -teach religion. Nor are the line-drawing challenges here unique; they have arisen before and will *2276 again. See Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct., at 2025-2026 (opinion of GORSUCH, J.).
Most importantly, though, it is not as if the First Amendment cares. The Constitution forbids laws that prohibit the free exercise of religion. That guarantee protects not just the right to be a religious person, holding beliefs inwardly and secretly; it also protects the right to act on those beliefs outwardly and publicly. At the time of the First Amendment's adoption, the word "exercise" meant (much as it means today) some "[l]abour of the body," a "[u]se," as in the "actual application of any thing," or a "[p]ractice," as in some "outward performance." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773); see also ibid. (5th ed. 1784). By speaking of a right to "free exercise," rather than a right "of conscience," an alternative the framers considered and rejected, our Constitution "extended the broader freedom of action to all believers." McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1490 (1989). So whether the Montana Constitution is better described as discriminating against religious status or use makes no difference: It is a violation of the right to free exercise either way, unless the State can show its law serves some compelling and narrowly tailored governmental interest, conditions absent here for reasons the Court thoroughly explains.
Our cases have long recognized the importance of protecting religious actions, not just religious status. In its very first decision applying the Free Exercise Clause to the States, the Court explained that the First Amendment protects the "freedom to act" as well as the "freedom to believe." Cantwell v. Connecticut , 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Court then reversed a criminal conviction against Newton Cantwell and his sons, Jehovah's Witnesses who were prosecuted not because of who they were but because of what they did-proselytize door-to-door without a license. See id. , at 300-301, 307, 311, 60 S.Ct. 900. In fact, this Court has already recognized that parents' decisions about the education of their children-the very conduct at issue here-can constitute protected religious activity. In Wisconsin v. Yoder , 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court held that Amish parents could not be compelled to send their children to a public high school if doing so would conflict with the dictates of their faith. See id ., at 214-215, 220, 234-235, 92 S.Ct. 1526.
Even cases that seemingly focus on religious status do so with equal respect for religious actions. In McDaniel v. Paty , 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (plurality opinion), for example, a State had barred the clergy from serving in the state legislature or at the state constitutional convention. See id., at 620-622, 98 S.Ct. 1322. Some have described the discrimination there as focused on religious " ' status.' " Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2015 (quoting McDaniel , 435 U.S. at 627, 98 S.Ct. 1322 ) (emphasis deleted). But no one can question that conduct lurked just beneath the surface. After all, the State identified clergy based on their "conduct and activity," and the plurality opinion concluded that the State's prohibition was based on "status, acts, and conduct." 435 U.S. at 627, 98 S.Ct. 1322 ; see also id., at 630-633, 98 S.Ct. 1322 (Brennan, J., concurring in judgment); Church of Lukumi Babalu Aye, Inc. v. Hialeah , 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
Consistently, too, we have recognized the First Amendment's protection for religious conduct in public benefits cases. When the government chooses to offer *2277 scholarships, unemployment benefits, or other affirmative assistance to its citizens, those benefits necessarily affect the "baseline against which burdens on religion are measured." Locke v. Davey , 540 U.S. 712, 726, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (Scalia, J., dissenting) (citing Everson v. Board of Ed. of Ewing , 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947) ). So, as we have long explained, the government "penalize[s] religious activity" whenever it denies to religious persons an "equal share of the rights, benefits, and privileges enjoyed by other citizens." Lyng v. Northwest Indian Cemetery Protective Assn. , 485 U.S. 439, 449, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). What benefits the government decides to give, whether meager or munificent, it must give without discrimination against religious conduct.
Our cases illustrate the point. In Sherbert v. Verner , 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), for example, a State denied unemployment benefits to Adell Sherbert not because she was a Seventh Day Adventist but because she had put her faith into practice by refusing to labor on the day she believed God had set aside for rest. See id. , at 399-401, 83 S.Ct. 1790. Recognizing her right to exercise her religion freely, the Court held that Ms. Sherbert was entitled to benefits. See id. , at 410, 83 S.Ct. 1790. Similarly, in Thomas v. Review Bd. of Ind. Employment Security Div. , 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Court held that Eddie Thomas had the right to resign from his job and still collect an unemployment check after he decided he could not assemble military tank turrets consistent with the teachings of his faith. See id ., at 709-712, 720, 101 S.Ct. 1425. In terms that speak equally to our case, the Court explained that the government tests the Free Exercise Clause whenever it "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or ... denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Id. , at 717-718, 101 S.Ct. 1425.
The First Amendment protects religious uses and actions for good reason. What point is it to tell a person that he is free to be Muslim but he may be subject to discrimination for doing what his religion commands, attending Friday prayers, living his daily life in harmony with the teaching of his faith, and educating his children in its ways? What does it mean to tell an Orthodox Jew that she may have her religion but may be targeted for observing her religious calendar? Often, governments lack effective ways to control what lies in a person's heart or mind. But they can bring to bear enormous power over what people say and do. The right to be religious without the right to do religious things would hardly amount to a right at all.
If the government could intrude so much in matters of faith, too, winners and losers would soon emerge. Those apathetic about religion or passive in its practice would suffer little in a world where only inward belief or status is protected. But what about those with a deep faith that requires them to do things passing legislative majorities might find unseemly or uncouth-like knocking on doors to spread their beliefs, refusing to build tank turrets during wartime, or teaching their children at home? "[T]hose who take their religion seriously, who think that their religion should affect the whole of their lives," and those whose religious beliefs and practices are least popular, would face the greatest disabilities. Mitchell v. Helms , 530 U.S. 793, 827-828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). A right meant to protect minorities instead could become a cudgel to ensure conformity.
*2278 It doesn't take a long or searching look through history or around the world to see how this can go. In the century before our Nation's founding, Oliver Cromwell promised to Catholics in Ireland: " 'As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted.' " McDaniel , 435 U.S. at 631, n. 2, 98 S.Ct. 1322 (opinion of Brennan, J.) (quoting S. Hook, Paradoxes of Freedom 23 (1962)); see also 1 T. Carlyle, Oliver Cromwell's Letters and Speeches 395 (1845) (recording Cromwell's October 19, 1649, letter to the Governor of Ross). Even today, in fiefdoms small and large, people of faith are made to choose between receiving the protection of the State and living lives true to their religious convictions.
Of course, in public benefits cases like the one before us the stakes are not so dramatic. Individuals are forced only to choose between forgoing state aid or pursuing some aspect of their faith. The government does not put a gun to the head, only a thumb on the scale. But, as so many of our cases explain, the Free Exercise Clause doesn't easily tolerate either; any discrimination against religious exercise must meet the demands of strict scrutiny. In this way, the Clause seeks to ensure that religion remains "a matter of voluntary choice by individuals and their associations, [where] each sect ' flourish[es] according to the zeal of its adherents and the appeal of its dogma,' " influenced by neither where the government points its gun nor where it places its thumb. McDaniel , 435 U.S. at 640, 98 S.Ct. 1322 (opinion of Brennan J.) (quoting Zorach v. Clauson , 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ).
Montana's Supreme Court disregarded these foundational principles. Effectively, the court told the state legislature and parents of Montana like Ms. Espinoza: You can have school choice, but if anyone dares to choose to send a child to an accredited religious school, the program will be shuttered. That condition on a public benefit discriminates against the free exercise of religion. Calling it discrimination on the basis of religious status or religious activity makes no difference: It is unconstitutional all the same.
Justice GINSBURG, with whom Justice KAGAN joins, dissenting.
The Montana Legislature enacted a scholarship program to fund tuition for students attending private secondary schools. See Mont. Code Ann. § 15-30-3111 (2019). In the decision below, the Montana Supreme Court struck down that program in its entirety. The program, the state court ruled, conflicted with the State Constitution's no-aid provision, which forbids government appropriations to religious schools. Mont. Const., Art. X, § 6 (1). Parents who sought to use the program's scholarships to fund their children's religious education challenged the state court's ruling. They argue in this Court that the Montana court's application of the no-aid provision violated the Free Exercise Clause of the Federal Constitution. Importantly, the parents, petitioners here, disclaim any challenge to the no-aid provision on its face. They instead argue-and this Court's majority accepts-that the provision is unconstitutional as applied because the First Amendment prohibits discrimination in tuition-benefit programs based on a school's religious status. Because the state court's decision does not so discriminate, I would reject petitioners' free exercise claim.
*2279 The First Amendment prohibits the government from "mak[ing a] law ... prohibiting the free exercise" of religion. U.S. Const., Amdt. 1. This Court's decisions have recognized that a burden on religious exercise may occur both when a State proscribes religiously motivated activity and when a law pressures an adherent to abandon her religious faith or practice. Sherbert v. Verner , 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ; Hobbie v. Unemployment Appeals Comm'n of Fla. , 480 U.S. 136, 140-141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). The Free Exercise Clause thus protects against "indirect coercion or penalties on the free exercise of religion." Lyng v. Northwest Indian Cemetery Protective Assn. , 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Invoking that principle in Trinity Lutheran Church of Columbia, Inc. v. Comer , 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), the Court observed that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" can impose "a penalty on the free exercise of religion." Id. , at ---- - ----, 137 S.Ct., at 2020. The Court then concluded that a Missouri law making churches ineligible for a government playground-refurbishing grant impermissibly burdened the church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit." Id. , at ----, 137 S.Ct., at 2024.
Petitioners argue that the Montana Supreme Court's decision fails when measured against Trinity Lutheran . I do not see how. Past decisions in this area have entailed differential treatment occasioning a burden on a plaintiff 's religious exercise. Lyng , 485 U.S. at 450-451, 108 S.Ct. 1319 ; Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2022. This case is missing that essential component. Recall that the Montana court remedied the state constitutional violation by striking the scholarship program in its entirety. Under that decree, secular and sectarian schools alike are ineligible for benefits, so the decision cannot be said to entail differential treatment based on petitioners' religion. Put somewhat differently, petitioners argue that the Free Exercise Clause requires a State to treat institutions and people neutrally when doling out a benefit-and neutrally is how Montana treats them in the wake of the state court's decision.
Accordingly, the Montana Supreme Court's decision does not place a burden on petitioners' religious exercise. Petitioners may still send their children to a religious school. And the Montana Supreme Court's decision does not pressure them to do otherwise. Unlike the law in Trinity Lutheran , the decision below puts petitioners to no "choice": Neither giving up their faith, nor declining to send their children to sectarian schools, would affect their entitlement to scholarship funding. 582 U.S., at ----, 137 S.Ct., at 2021. There simply are no scholarship funds to be had.
True, petitioners expected to be eligible for scholarships under the legislature's program, and to use those scholarships at a religious school. And true, the Montana court's decision disappointed those expectations along with those of parents who send their children to secular private schools. But, as Justice SOTOMAYOR observes, see post, at 2293 (dissenting opinion), this Court has consistently refused to treat neutral government action as unconstitutional solely because it fails to benefit religious exercise. See Sherbert , 374 U.S. at 412, 83 S.Ct. 1790 (Douglas, J., concurring) ("[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.").
*2280 These considerations should be fatal to petitioners' free exercise claim, yet the Court does not confront them. Instead, the Court decides a question that, in my view, this case does not present: "[W]hether excluding religious schools and affected families from [the scholarship] program was consistent with the Federal Constitution." Ante , at 2254 (majority opinion). The Court goes on to hold that the Montana Supreme Court's application of the no-aid provision violates the Free Exercise Clause because it " 'condition[s] the availability of benefits upon a recipient's willingness to surrender [its] religiously impelled status.' " Ante , at 2256 (quoting Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct., at 2021-2022 ; alterations in original). As I see it, the decision below-which maintained neutrality between sectarian and nonsectarian private schools-did no such thing.
Finding the "beginning" of the Montana Supreme Court's decision erroneous, this Court regards the state court's ultimate judgment as irrelevant. Ante, at 2261 - 2263. In the Court's recounting, the Montana court first held that religious schools must be excluded from the scholarship program-necessarily determining that the Free Exercise Clause permitted that result-and only subsequently struck the entire program as a way of carrying out its holding. See ante, at 2262 ("When the [Montana Supreme] Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the Federal Constitution to reject the invitation."). But the initial step described by this Court is imaginary. The Montana court determined that the scholarship program violated the no-aid provision because it resulted in aid to religious schools. Declining to rewrite the statute to exclude those schools, the state court struck the program in full. 393 Mont. 446, 463-468, 435 P.3d 603, 612-614 (2018). In doing so, the court never made religious schools ineligible for an otherwise available benefit, and it never decided that the Free Exercise Clause would allow that outcome.[1]
Thus, contrary to this Court's assertion, see ante, at ----, the no-aid provision did not require the Montana Supreme
Court to "exclude" religious schools from the scholarship program. The provision mandated only that the state treasury not be used to fund religious schooling. As this case demonstrates, that mandate does not necessarily require differential treatment. The no-aid provision can be implemented in two ways. A State may distinguish within a benefit program between secular and sectarian schools, or it may decline to fund all private schools. The Court agrees that the First Amendment permits the latter course. See ante, at 2261 - 2262. Because that is the path the Montana Supreme Court took in this case, there was no reason for this Court to address the alternative.
By urging that it is impossible to apply the no-aid provision in harmony with the Free Exercise Clause, the Court seems to treat the no-aid provision itself as unconstitutional. See ante, at 2262. Petitioners, *2281 however, disavowed a facial First Amendment challenge, and the state courts were never asked to address the constitutionality of the no-aid provision divorced from its application to a specific government benefit. See, e.g ., Reply Brief 8, 20, 21-22. This Court therefore had no call to reach that issue. See Adams v. Robertson , 520 U.S. 83, 90, 117 S.Ct. 1028, 137 L.Ed.2d 203 (1997) (per curiam ) (" '[I]t would be unseemly in our dual system of government' to disturb the finality of state judgments on a federal ground that the state court did not have occasion to consider." (quoting Webb v. Webb , 451 U.S. 493, 500, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981) )). The only question properly raised is whether application of the no-aid provision to bar all state-sponsored private-school funding violates the Free Exercise Clause. For the reasons stated, supra, at 2279 - 2280, it does not.
Nearing the end of its opinion, the Court writes: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." Ante , at 2261. Because Montana's Supreme Court did not make such a decision-its judgment put all private school parents in the same boat-this Court had no occasion to address the matter.[2] On that sole ground, and reaching no other issue, I dissent from the Court's judgment.
Justice BREYER, with whom Justice KAGAN joins as to Part I, dissenting.
The First Amendment's Free Exercise Clause guarantees the right to practice one's religion. At the same time, its Establishment Clause forbids government support for religion. Taken together, the Religion Clauses have helped our Nation avoid religiously based discord while securing liberty for those of all faiths.
This Court has long recognized that an overly rigid application of the Clauses could bring their mandates into conflict and defeat their basic purpose. See, e.g. , Walz v. Tax Comm'n of City of New York , 397 U.S. 664, 668-669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). And this potential conflict is nowhere more apparent than in cases involving state aid that serves religious purposes or institutions. In such cases, the Court has said, there must be constitutional room, or " 'play in the joints,' " between "what the Establishment Clause permits and the Free Exercise Clause compels." Trinity Lutheran Church of Columbia , Inc. v. Comer , 582 U.S. ----, ----, 137 S.Ct. 2012, 2019, 198 L.Ed.2d 551 (2017) (quoting Locke v. Davey , 540 U.S. 712, 718, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ). Whether a particular state program falls within that space depends upon the nature of the aid at issue, considered in light of the Clauses' objectives.
The majority barely acknowledges the play-in-the-joints doctrine here. It holds that the Free Exercise Clause forbids a State to draw any distinction between secular and religious uses of government aid to private schools that is not required by the Establishment Clause. The majority's approach and its conclusion in this case, I fear, risk the kind of entanglement and conflict that the Religion Clauses are intended to prevent. I consequently dissent.
*2282 I
In 2015, Montana's Legislature enacted a statute giving a $150 tax credit to any person who contributes at least that amount to an organization that provides scholarships for students who attend non-public schools. See Mont. Code Ann. § 15-30-3111 (2019). The overwhelming majority of these schools are religious. (In 2018, 94% of the scholarships awarded helped to pay religious-school tuition. 393 Mont. 446, 466, 478-479, and n. 6, 435 P.3d 603, 613, 621, and n. 6 ; App to Pet. for Cert. 123, 125.) The Montana Supreme Court held that this program violated a state constitutional provision that forbids the legislature to make "any direct or indirect appropriation or payment" for "any sectarian purpose or to aid any church, school, academy ... controlled in whole or in part by any church, sect, or denomination." Mont. Const., Art. X, § 6.
Petitioners are the parents of students who attend one of Montana's Christian private schools. They believe that the tenets of their faith require them to send their children to a religious school. And they claim that, by preventing them from using state-supported scholarships at those schools, the Montana Supreme Court's interpretation of Montana's Constitution violates their First Amendment right to free exercise. I shall assume, for purposes of this opinion, that petitioners' free exercise claim survived the Montana Supreme Court's wholesale invalidation of the tax credit program. Cf. ante , at 2279 (GINSBURG, J., dissenting); post , at 2292 - 2293 (SOTOMAYOR, J., dissenting).
A
We all recognize that the First Amendment prohibits discrimination against religion. At the same time, our history and federal constitutional precedent reflect a deep concern that state funding for religious teaching, by stirring fears of preference or in other ways, might fuel religious discord and division and thereby threaten religious freedom itself. See, e.g. , Committee for Public Ed. & Religious Liberty v. Nyquist , 413 U.S. 756, 794-796, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). The Court has consequently made it clear that the Constitution commits the government to a "position of neutrality" in respect to religion. School Dist. of Abington Township v. Schempp , 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
The inherent tension between the Establishment and Free Exercise Clauses means, however, that the "course of constitutional neutrality in this area cannot be an absolutely straight line." Walz , 397 U.S. at 669, 90 S.Ct. 1409. Indeed, "rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." Ibid.
That, in significant part, is why the Court has held that "there is room for play in the joints" between the Clauses' express prohibitions that is "productive of a benevolent neutrality," allowing "religious exercise to exist without sponsorship and without interference." Ibid. It has held that there "are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." Locke , 540 U.S. at 719, 124 S.Ct. 1307 ; see Cutter v. Wilkinson , 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). And that "play in the joints" should, in my view, play a determinative role here.
It may be that, under our precedents, the Establishment Clause does not forbid Montana to subsidize the education of petitioners' children. But, the question here is whether the Free Exercise Clause requires it to do so. The majority believes that the answer to that question is "yes." It writes that "once a State decides" to *2283 support nonpublic education, "it cannot disqualify some private schools solely because they are religious." Ante , at 2261. I shall explain why I disagree.
B
As the majority acknowledges, two cases are particularly relevant: Trinity Lutheran Church of Columbia , Inc. v. Comer , 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), and Locke v. Davey , 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1. In Trinity Lutheran , we considered whether Missouri could exclude a church-owned preschool from applying for a grant to renovate its playground. The Court assumed that the Establishment Clause permitted the State to make grants of this kind to church-affiliated schools. See 582 U.S., at ----, 137 S.Ct., at 2019-2020. But, the Court added, this did not "answer the question" because there is " 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." Ibid . The Court therefore went on to consider the burdens that Missouri's law imposed upon the church's right to free exercise.
By excluding schools with ties to churches, the Court wrote, the State's law put the church "to a choice: It may participate in an otherwise available benefit program or remain a religious institution." Id. , at ----, 137 S.Ct., at 2021-2022. That kind of " 'indirect coercion,' " the Court explained, "imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." Id. , at ----, ----, 137 S.Ct., at 2021. Finding that a State's "policy preference for skating as far as possible from religious establishment concerns" could not satisfy that standard, the Court held that the Free Exercise Clause required Missouri to include church-affiliated schools as candidates for playground renovation grants. Id. , at ----, 137 S.Ct., at 2024.
We confronted a different kind of aid program, and came to a different conclusion, in Locke . There, we reviewed a Washington law that offered taxpayer-funded scholarships to college students on the express condition that they not pursue degrees that were " 'devotional in nature or designed to induce religious belief.' " 540 U.S. at 716, 124 S.Ct. 1307 ; see id. , at 719, n. 2, 124 S.Ct. 1307 (quoting Wash. Const., Art. II, § 11 ). Again, the Court assumed that the Establishment Clause permitted the State to support students seeking such degrees. 540 U.S. at 719, 124 S.Ct. 1307. But the Court concluded that the Free Exercise Clause did not require it to do so.
The Court observed that the State's decision not to fund devotional degrees did not penalize religious exercise or require anyone to choose between their faith and a "government benefit." Id. , at 721, 124 S.Ct. 1307. Rather, the State had "merely chosen not to fund a distinct category of instruction" that was "essentially religious." Ibid. Although Washington's Constitution drew "a more stringent line than that drawn by the United States Constitution," the Court found that the State's position was consistent with the widely shared view, dating to the founding of the Republic, that taxpayer-supported religious indoctrination poses a threat to individual liberty. Id. , at 722, 124 S.Ct. 1307. Given this "historic and substantial state interest," the Court concluded, it would be inappropriate to subject Washington's law to a "presumption of unconstitutionality." Id. , at 725, 124 S.Ct. 1307. And, without such a presumption, the claim that the exclusion of devotional studies violated the Free Exercise Clause "must fail," for "[i]f any room exists between the two Religion Clauses, it must be here." Ibid. ; see id. , at 721, n. 3, 124 S.Ct. 1307.
*2284 C
The majority finds that the school-playground case, Trinity Lutheran , and not the religious-studies case, Locke , controls here. I disagree. In my view, the program at issue here is strikingly similar to the program we upheld in Locke and importantly different from the program we found unconstitutional in Trinity Lutheran . Like the State of Washington in Locke , Montana has chosen not to fund (at a distance) "an essentially religious endeavor"-an education designed to " 'induce religious faith.' " Locke , 540 U.S. at 716, 721, 124 S.Ct. 1307. That kind of program simply cannot be likened to Missouri's decision to exclude a church school from applying for a grant to resurface its playground.
The Court in Locke recognized that the study of devotional theology can be "akin to a religious calling as well as an academic pursuit." Id. , at 721, 124 S.Ct. 1307. Indeed, "the shaping, through primary education, of the next generation's minds and spirits" may be as critical as training for the ministry, which itself, after all, is but one of the activities necessary to help assure a religion's survival. Zelman v. Simmons-Harris , 536 U.S. 639, 725, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (BREYER, J., dissenting). That is why many faith leaders emphasize the central role of schools in their religious missions. See, e.g. , Southern Baptist Convention, Resolution on the Importance of Christ-Centered Education (2014) (underscoring the power of Christian schools to "win students to salvation through evangelism, make disciples, and foster spiritual development"); The Holy See, John Paul II, Catechesi Tradendae ¶69 (Oct. 16, 1979) (explaining that "the underlying reason for" the Catholic school "is precisely the quality of the religious instruction integrated into the education of the pupils"). It is why at least some teachers at religious schools see their work as a form of ministry. See, e.g. , Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC , 565 U.S. 171, 192, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). And petitioners have testified that it is a "major reason" why they chose religious schools for their children. App. to Pet. for Cert. 152 (the school teaches "the same Christian values that I teach at home").
Nothing in the Constitution discourages this type of instruction. To the contrary, the Free Exercise Clause draws upon a history that places great value upon the freedom of parents to teach their children the tenets of their faith. Cf. Wisconsin v. Yoder , 406 U.S. 205, 213-214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The leading figures of America's Enlightenment followed in the footsteps of those who, after the English civil wars, came to believe "with a passionate conviction that they were entitled to worship God in their own way and to teach their children and to form their characters in the way that seemed to them calculated to impress the stamp of the God-fearing man." C. Radcliffe, The Law & Its Compass 71 (1960). But the bitter lesson of religious conflict also inspired the Establishment Clause and the state-law bans on compelled support the Court cited in Locke . Cf., e.g. , J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in Everson v. Board of Ed. of Ewing , 330 U.S. 1, 69, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (appendix to dissent of Rutledge, J.) (recalling the "[t]orrents of blood" shed in efforts to establish state religion).
What, then, is the difference between Locke and the present case? And what is it that leads the majority to conclude that funding the study of religion is more like paying to fix up a playground ( Trinity Lutheran ) than paying for a degree in theology ( Locke )? The majority's principal argument appears to be that, as in *2285 Trinity Lutheran , Montana has excluded religious schools from its program "solely because of the religious character of the schools." Ante , at 2255. The majority seeks to contrast this status -based discrimination with the program at issue in Locke , which it says denied scholarships to divinity students based on the religious use to which they put the funds-i.e. , training for the ministry, as opposed to secular professions. See ante , at 2256 - 2257 (citing Trinity Lutheran , 582 U.S., at ---- - ----, 137 S.Ct.. at 2021-2022 ).
It is true that Montana's no-aid provision broadly bars state aid to schools based on their religious affiliation. But this case does not involve a claim of status-based discrimination. The schools do not apply or compete for scholarships, they are not parties to this litigation, and no one here purports to represent their interests. We are instead faced with a suit by parents who assert that their free exercise rights are violated by the application of the no-aid provision to prevent them from using taxpayer-supported scholarships to attend the schools of their choosing. In other words, the problem, as in Locke , is what petitioners " 'propos[e] to do -use the funds to' " obtain a religious education. Ante , 2257 (quoting Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2023 ).
Even if the schools' status were relevant, I do not see what bearing the majority's distinction could have here. There is no dispute that religious schools seek generally to inspire religious faith and values in their students. How else could petitioners claim that barring them from using state aid to attend these schools violates their free exercise rights? Thus, the question in this case-unlike in Trinity Lutheran -boils down to what the schools would do with state support. And the upshot is that here, as in Locke , we confront a State's decision not to fund the inculcation of religious truths.
The majority next contends that there is no " 'historic and substantial' tradition against aiding" religious schools "comparable to the tradition against state-supported clergy invoked by Locke ." Ante , at 2259. But the majority ignores the reasons for the founding era bans that we relied upon in Locke .
"Perhaps the most famous example," Locke , 540 U.S. at 722, n. 6, 124 S.Ct. 1307, is the 1786 defeat of a Virginia bill (often called the Assessment Bill) that would have levied a tax in support of "learned teachers" of "the Christian Religion." A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in Everson , 330 U.S. at 72, 67 S.Ct. 504 (supplemental appendix to dissent of Rutledge, J.). In his Memorial and Remonstrance against that proposal, James Madison argued that compelling state sponsorship of religion in this way was "a signal of persecution" that "degrades from the equal rank of citizens all those whose opinions in religion do not bend to those of the Legislative authority." Id. , at 68-69, 67 S.Ct. 504. Even among those who might benefit from such a tax, Madison warned, the bill threatened to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." Id. , at 69, 67 S.Ct. 504.
The opposition galvanized by Madison's Remonstrance not only scuttled the Assessment Bill; it spurred Virginia's Assembly to enact a very different law, the Bill for Religious Liberty drafted by Thomas Jefferson. See Brant, Madison: On the Separation of Church and State, 8 Wm. & Mary Q. 3, 11 (1951);
*2286 Drakeman, Religion and the Republic: James Madison and the First Amendment, 25 J. Church & St. 427, 436 (1983); Everson , 330 U.S. at 12, 67 S.Ct. 504.
Like the Remonstrance, Jefferson's bill emphasized the risk to religious liberty that state-supported religious indoctrination threatened. "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves," the preamble declared, "is sinful and tyrannical." A Bill for Establishing Religious Freedom (1779), in 2 The Papers of Thomas Jefferson 545 (J. Boyd ed. 1950). The statute accordingly provided "that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever." Id. , at 546. Similar proscriptions were included in the early constitutions of many States. See Locke , 540 U.S. at 723, 124 S.Ct. 1307 (collecting examples).
I see no meaningful difference between the concerns that Madison and Jefferson raised and the concerns inevitably raised by taxpayer support for scholarships to religious schools. In both instances state funds are sought for those who would "instruc[t] such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge" in the tenets of religious faith. A Bill Establishing a Provision for Teachers of the Christian Religion, reprinted in Everson , 330 U.S. at 72, 67 S.Ct. 504. In both cases, that would compel taxpayers "to support the propagation of opinions" on matters of religion with which they may disagree, by teachers whom they have not chosen. A Bill for Establishing Religious Freedom, supra , at 545. And, in both cases, the allocation of state aid to such purposes threatens to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced among its several sects." Memorial and Remonstrance, reprinted in Everson , 330 U.S. at 69, 67 S.Ct. 504.
The majority argues that at least some early American governments saw no contradiction between bans on compelled support for clergy and taxpayer support for religious schools or universities. See ante , at 2258, n. 3. That some States appear not to have read their prohibitions on compelled support to bar this kind of sponsorship, however, does not require us to blind ourselves to the obvious contradiction between the reasons for prohibiting compelled support and the effect of taxpayer funding for religious education. Madison and Jefferson saw it clearly. They opposed including theological professorships in their plans for the public University of Virginia and the Commonwealth hesitated even to grant charters to religiously affiliated schools. See Buckley, After Disestablishment: Thomas Jefferson's Wall of Separation in Antebellum Virginia, 61 J. So. Hist. 445, 453 (1995); Brant, supra, at 19-20.
As for the majority's examples, it suffices to say that the record is not so simple. In Georgia, the Governor advocated for school funding legislation in terms that mirrored the language of Virginia's Assessment Bill. See R. Gabel, Public Funds for Church and Private Schools 241-242 (1937). And the general levies the majority cites from Pennsylvania and New Jersey were not adopted until after the founding. See id., at 215-216; see C. Kaestle, Pillars of the Republic: Common Schools and American Society, 1780-1860, pp. 166-167 (1983).
That is not to deny that the history of state support for denominational schools is " 'complex.' " Ante , at 2259. But founding era attitudes toward compelled support of clergy were no less complex. Many prominent members of the founding generation, including George Washington, Patrick Henry, and John Marshall, supported Virginia's Assessment Bill. See Dreisbach, *2287 George Mason's Pursuit of Religious Liberty in Revolutionary Virginia, 108 Va. Mag. Hist. & Biography 5, 31 (2000). Some who supported this kind of government aid thought it posed no threat to freedom of conscience; others denied that provisions for aid to religion amounted to an "establishment" at all. See id., at 34-35; D. Drakeman, Church, State, and Original Intent 224-225 (2010). Indeed, at least one historian has persuasively argued that it is next to impossible to attribute to the Founders any uniform understanding as to what constitutes, in the Constitution's phrase, "an Establishment of religion." Id. , at 216-229, 260-262.
This diversity of opinion made no difference in Locke and it makes no difference here. For our purposes it is enough to say that, among those who gave shape to the young Republic were people, including Madison and Jefferson, who perceived a grave threat to individual liberty and communal harmony in tax support for the teaching of religious truths. These "historic and substantial" concerns have consistently guided the Court's application of the Religion Clauses since. Locke , 540 U.S. at 725, 124 S.Ct. 1307 ; see, e.g. , Nyquist , 413 U.S. at 794-798, 93 S.Ct. 2955 ; Walz , 397 U.S. at 695, 90 S.Ct. 1409 (Harlan, J., concurring); Schempp , 374 U.S. at 307, 83 S.Ct. 1560 (Goldberg, J., joined by Harlan, J., concurring). The Court's special attention to these views should come as no surprise, for the risks the Founders saw have only become more apparent over time. In the years since the Civil War, the number of religions practiced in our country has grown to scores. And that has made it more difficult to avoid suspicions of favoritism-or worse-when government becomes entangled with religion.
Nor can I see how it could make a difference that the Establishment Clause might permit the State to subsidize religious education through a program like Montana's. The tax benefit here inures to donors, who choose to support a particular scholarship organization. That organization, in turn, awards scholarships to students for the qualifying school of their choice. The majority points to cases in which we have upheld programs where, as here, state funds make their way to religious schools by means of private choices. Ante , at 2254 (citing Zelman , 536 U.S. at 649-653, 122 S.Ct. 2460 ). As the Court acknowledged in Trinity Lutheran , however, that does not answer the question whether providing such aid is required . 582 U.S., at ----, 137 S.Ct., at 2019-2020.
Neither does it address related concerns that I have previously described. Private choice cannot help the taxpayer who does not want to finance the propagation of religious beliefs, whether his own or someone else's. It will not help religious minorities too few in number to support a school that teaches their beliefs. And it will not satisfy those whose religious beliefs preclude them from participating in a government-sponsored program. Some or many of the persons who fit these descriptions may well feel ignored-or worse-when public funds are channeled to religious schools. See Zelman , 536 U.S. at 728, 122 S.Ct. 2460 (BREYER, J., dissenting). These feelings may, in turn, sow religiously inspired political conflict and division-a risk that is considerably greater where States are required to include religious schools in programs like the one before us here. And it is greater still where, as here, those programs benefit only a handful of a State's many religious denominations. See ibid . ; Big Sky Scholarships, Schools (2019), www.bigskyscholarships.org/schools.
Indeed, the records of Montana's constitutional convention show that these concerns were among the reasons that a religiously diverse group of delegates, including *2288 faith leaders of different denominations, supported the no-aid provision. See Brief for Respondents 18-23; Brief for Montana Constitutional Convention Delegates as Amici Curiae 19-21, 22, 24-25 (noting support for the provision from a Congregationalist minister, the Roman Catholic priest responsible for Catholic schools in the Diocese of Great Falls, a Methodist pastor, a Presbyterian minister, and the Montana Catholic Conference, among others).
In an effort to downplay this risk and further distinguish this case from Locke , the majority contends that "Montana's Constitution does not zero in on any particular 'essentially religious' course of instruction." Ante , at 2257 (quoting Locke , 540 U.S. at 721, 124 S.Ct. 1307 ). But this is not a facial challenge to the no-aid provision. See Reply Brief 8. As applied, the provision affects only a scholarship program that, in effect, uses taxpayer funds to help pay for student tuition at religious schools. We have long recognized that unrestricted cash payments of this kind raise special establishment concerns. Cf. Mitchell v. Helms , 530 U.S. 793, 818-819, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion); see id. , at 848-849, 120 S.Ct. 2530 (O'Connor, J., concurring in judgment). And for good reason: The subsidy petitioners demand would go to pay for, among other things, the salaries of teachers and administrators who have been found in at least some instances to so "personify [the] beliefs" of the churches that employ them that they are quite literally "ministers" within the meaning of the First Amendment. Hosanna-Tabor , 565 U.S. at 188, 132 S.Ct. 694.
If, for 250 years, we have drawn a line at forcing taxpayers to pay the salaries of those who teach their faith from the pulpit, I do not see how we can today require Montana to adopt a different view respecting those who teach it in the classroom.
II
In reaching its conclusion that the Free Exercise Clause requires Montana to allow petitioners to use taxpayer-supported scholarships to pay for their children's religious education, the majority makes several doctrinal innovations that, in my view, are misguided and threaten adverse consequences.
Although the majority refers in passing to the "play in the joints" between that which the Establishment Clause forbids and that which the Free Exercise Clause requires, its holding leaves that doctrine a shadow of its former self. See, e.g. , Cutter , 544 U.S. at 719, 125 S.Ct. 2113 ; Walz , 397 U.S. at 669, 90 S.Ct. 1409. Having concluded that there is no obstacle to subsidizing a religious education under our Establishment Clause precedents, the majority says little more about Montana's antiestablishment interests or the reasoning that underlies them. It does not engage with the State's concern that its funds not be used to support religious teaching. Instead, the Court holds that it need not consider how Montana's funds would be used because, in its view, all distinctions on the basis of religion-whether in respect to playground grants or devotional teaching-are similarly and presumptively unconstitutional. See ante , at 2255 - 2256.
Setting aside the problems with the majority's characterization of this case, supra , at 2254 - 2255, I think the majority is wrong to replace the flexible, context-specific approach of our precedents with a test of "strict" or "rigorous" scrutiny. And it is wrong to imply that courts should use that same heightened scrutiny whenever a government benefit is at issue. See ante , at 2255, 2256 - 2257.
*2289 Experience has taught us that "we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication." Tilton v. Richardson , 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion); see also Schempp , 374 U.S. at 306, 83 S.Ct. 1560 (opinion of Goldberg, J., joined by Harlan, J.) (there is "no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible"); Walz , 397 U.S. at 669, 90 S.Ct. 1409 ("[R]igidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited"). If the Court has found it possible to walk what we have called the " 'tight rope' " between the two Religion Clauses, it is only by "preserving doctrinal flexibility and recognizing the need for a sensible and realistic application" of those provisions. Yoder , 406 U.S. at 221, 92 S.Ct. 1526.
The Court proceeded in just this way in Locke . It considered the same precedents the majority today cites in support of its presumption of unconstitutionality. But it found that applying the presumption set forth in those cases to Washington's decision not to fund devotional degrees would "extend" them "well beyond not only their facts but their reasoning." 540 U.S. at 720, 124 S.Ct. 1307. In my view, that analysis applies equally to this case.
Montana's law does not punish religious exercise. Cf. Locke , 540 U.S. at 720, 124 S.Ct. 1307 (citing Church of Lukumi Babalu Aye, Inc. v. Hialeah , 508 U.S. 520, 535, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ); see ante , at 2256 - 2257. It does not deny anyone, because of their faith, the right to participate in political affairs of the community. Cf. Locke , 540 U.S. at 720-721, 124 S.Ct. 1307 (citing McDaniel v. Paty , 435 U.S. 618, 626, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) ); see ante , at 2256 - 2257. And it does not require students to choose between their religious beliefs and receiving secular government aid such as unemployment benefits. Cf. Locke , 540 U.S. at 720, 124 S.Ct. 1307 (citing Sherbert v. Verner , 374 U.S. 398, 403-404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ); see ante , at 2256 - 2257. The State has simply chosen not to fund programs that, in significant part, typically involve the teaching and practice of religious devotion. And "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." Regan v. Taxation With Representation of Wash. , 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ; see also Lyng v. Automobile Workers , 485 U.S. 360, 368, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988).
I disagree, then, with what I see as the majority's doctrinal omission, its misplaced application of a legal presumption, and its suggestion that this presumption is appropriate in many, if not all, cases involving government benefits. As I see the matter, our differences run deeper than a simple disagreement about the application of prior case law.
The Court's reliance in our prior cases on the notion of "play in the joints," our hesitation to apply presumptions of unconstitutionality, and our tendency to confine benefitrelated holdings to the context in which they arose all reflect a recognition that great care is needed if we are to realize the Religion Clauses' basic purpose "to promote and assure the fullest scope of religious liberty and religious tolerance for all and to nurture the conditions which secure the best hope of attainment of that end." Schempp , 374 U.S. at 305, 83 S.Ct. 1560 (opinion of Goldberg, J., joined by Harlan, J.); see *2290 Van Orden v. Perry , 545 U.S. 677, 698, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment).
For one thing, government benefits come in many shapes and sizes. The appropriate way to approach a State's benefit-related decision may well vary depending upon the relation between the Religion Clauses and the specific benefit and restriction at issue. For another, disagreements that concern religion and its relation to a particular benefit may prove unusually difficult to resolve. They may involve small but important details of a particular benefit program. Does one detail affect one religion negatively and another positively? What about a religion that objects to the particular way in which the government seeks to enforce mandatory (say, qualification-related) provisions of a particular benefit program? See, e.g. , New Life Baptist Church Academy v. East Longmeadow , 885 F.2d 940 (CA1 1989) (BREYER, J., for the court). Or the religious group that for religious reasons cannot accept government support? See Brief for Respondents 20-21 (noting, inter alia , Seventh-day Adventists' support for Montana's no-aid provision on this ground). And what happens when qualification requirements mean that government money flows to one religion rather than another? Courts are ill equipped to deal with such conflicts. Yet, in a Nation with scores of different religions, many such disagreements are possible. And I have only scratched the surface.
The majority claims that giving weight to these considerations would be a departure from our precedent and give courts too much discretion to interpret the Religion Clauses. See ante , at 2259 - 2260. But we have long understood that the "application" of the First Amendment's mandate of neutrality "requires interpretation of a delicate sort." Schempp , 374 U.S. at 226, 83 S.Ct. 1560. "Each value judgment under the Religion Clauses," we have explained, must "turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." Walz , 397 U.S. at 669, 90 S.Ct. 1409.
Nor does the majority's approach avoid judicial entanglement in difficult and sensitive questions. To the contrary, as I have just explained, it burdens courts with the still more complex task of untangling disputes between religious organizations and state governments, instead of giving deference to state legislators' choices to avoid such issues altogether. At the same time, it puts States in a legislative dilemma, caught between the demands of the Free Exercise and Establishment Clauses, without "breathing room" to help ameliorate the problem.
I agree with the majority that it is preferable in some areas of the law to develop generally applicable tests. The problem, as our precedents show, is that the interaction of the Establishment and Free Exercise Clauses makes it particularly difficult to design a test that vindicates the Clauses' competing interests in all-or even most-cases. That is why, far from embracing mechanical formulas, our precedents repeatedly and frankly acknowledge the need for precisely the kind of " 'judgment-by-judgment analysis' " the majority rejects. Ante , at 2260; see, e.g. , Walz , 397 U.S. at 669, 90 S.Ct. 1409. "The standards" of our prior decisions, we have said, "should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired." Tilton , 403 U.S. at 678, 91 S.Ct. 2091 (plurality opinion); accord, Nyquist , 413 U.S. at 773, n. 31, 93 S.Ct. 2955.
The Court's occasional efforts to declare rules in spite of this experience have failed to produce either coherence or consensus in our First Amendment jurisprudence. See *2291 Van Orden , 545 U.S. at 697, 125 S.Ct. 2854 (BREYER, J., concurring in judgment) (listing examples). The persistence of such disagreements bears out what I have said-namely, that rigid, bright-line rules like the one the Court adopts today too often work against the underlying purposes of the Religion Clauses. And a test that fails to advance the Clauses' purposes is, in my view, far worse than no test at all.
Consider some of the practical problems that may arise from the Court's holding. The States have taken advantage of the "play in the joints" between the Religion Clauses to craft programs of public aid to education that address their local needs. Many provide assistance to families with students in nonpublic schools, ranging from scholarships to tax credits and deductions that reimburse tuition expenses. See Dept. of Ed., A Duncan et al., Education Options in the States 3-6 (2009). Although most state constitutions today have no-aid provisions like Montana's, those provisions are only one part of a broader system of local regulation. See App. D to Brief for Respondents. Some States have concluded that their no-aid provisions do not bar scholarships to students at religious schools, while others without such clauses have nevertheless chosen not to fund religious education. See Brief for State of Colorado et al. as Amici Curiae 6-7; Brief for State of Maine as Amicus Curiae 10-15. Today's decision upends those arrangements without stopping to ask whether they might actually further the objectives of the Religion Clauses in some or even many cases.
And what are the limits of the Court's holding? The majority asserts that States "need not subsidize private education." Ante , at 2261. But it does not explain why that is so. If making scholarships available to only secular nonpublic schools exerts "coercive" pressure on parents whose faith impels them to enroll their children in religious schools, then how is a State's decision to fund only secular public schools any less coercive? Under the majority's reasoning, the parents in both cases are put to a choice between their beliefs and a taxpayer-sponsored education.
Accepting the majority's distinction between public and nonpublic schools does little to address the uncertainty that its holding introduces. What about charter schools? States vary widely in how they permit charter schools to be structured, funded, and controlled. See Mead, Devilish Details: Exploring Features of Charter School Statutes That Blur the Public/Private Distinction, 40 Harv. J. Legis. 349, 353-357, 367-368 (2003). How would the majority's rule distinguish between those States in which support for charter schools is akin to public school funding and those in which it triggers a constitutional obligation to fund private religious schools? The majority's rule provides no guidance, even as it sharply limits the ability of courts and legislatures to balance the potentially competing interests that underlie the Free Exercise and Antiestablishment Clauses.
* * *
It is not easy to discern "the boundaries of the neutral area between" the two Religion Clauses "within which the legislature may legitimately act." Tilton , 403 U.S. at 677, 91 S.Ct. 2091 (plurality opinion). And it is more difficult still in cases, such as this one, where the Constitution's policy in favor of free exercise, on one hand, and against state sponsorship, on the other, are in conflict. In such cases, I believe there is "no test-related substitute for the exercise of legal judgment." Van Orden , 545 U.S. at 700, 125 S.Ct. 2854 (opinion of BREYER, J.). That judgment "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in *2292 light of those purposes." Ibid. Here, those purposes, along with the examples set by our decisions in Locke and Trinity Lutheran , lead me to believe that Montana's differential treatment of religious schools is constitutional. "If any room exists between the two Religion Clauses, it must be here." Locke , 540 U.S. at 725, 124 S.Ct. 1307. For these reasons, I respectfully dissent from the Court's contrary conclusion.

To revive their as-applied challenge, petitioners rely on Griffin v. School Bd. of Prince Edward Cty. , 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), for the proposition that eliminating a public benefit does not always remedy discrimination. See Reply Brief 5. But Griffin is inapposite. There, a Virginia county closed its public schools and so-called "private schools" were set up in their place to avoid a court desegregation order. See 377 U.S. at 223, 84 S.Ct. 1226. These so-called private schools "were open to whites only and ... were in fact run by a practical partnership between State and county, designed to preserve segregated education." Palmer v. Thompson , 403 U.S. 217, 221-222, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). That is nothing like what the Montana Supreme Court's remedy achieved here. Nor have petitioners said otherwise; there is no allegation that Montana confers clandestine tax credits solely to secular schools.

Petitioners here have not asserted a free exercise claim on a theory that they were victims of religious animus, either. Cf. Church of Lukumi Babalu Aye, Inc. v. Hialeah , 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Instead, one concurrence seeks to make the argument for them while attempting to compare the state constitutional provision here with a nonunanimous jury rule rooted in racial animus. Ante , at 2267 - 2268 (opinion of ALITO, J.) (citing the dissent in Ramos v. Louisiana , 590 U.S. ----, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) ). But those questions are not before the Court.
In any case, the concurrence's arguments are as misguided as they are misplaced. Citing the Court's opinion in Ramos , the concurrence maintains that a law's " 'uncomfortable past' must still be '[e]xamined.' " Ante , at 2273 (opinion of ALITO, J.). But as previously explained: "Where a law otherwise is untethered to [discriminatory] bias-and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it-the new law may well be free of discriminatory taint." Ramos , 590 U.S., at ----, 140 S.Ct., at 1410 (SOTOMAYOR, J., concurring in part). That could not "be said of the laws at issue" in Ramos . Ibid. It can be here. See Part II, infra .
The concurrence overlooks the starkly different histories of these state laws. Also missing from the concurrence (and the amicus briefs it repeats) is the stubborn fact that the constitutional provision at issue here was adopted in 1972 at a convention where it was met with overwhelming support by religious leaders (Catholic and non-Catholic), even those who examined the history of prior no-aid provisions. See Brief for Respondents 16-27; 6 Montana Constitutional Convention 1971-1972 Proceedings and Transcript, pp. 2012-2013, 2016-2017 (Mont. Legislature and Legislative Council); see also ante , at 2287 - 2288 (BREYER, J., dissenting); Brief for Public Funds Public Schools as Amicus Curiae 5-11; Brief for Montana Constitutional Convention Delegates as Amici Curiae 19-25. These supporters argued that it would be wrong to put taxpayer dollars to religious purposes and that it would invite unwelcome entanglement between church and state. See, e.g. , U.S. Const., Amdt. 1; Brief for Respondents 20.