Justice SOTOMAYOR, dissenting.
The majority holds that a Montana scholarship program unlawfully discriminated against religious schools by excluding them from a tax benefit. The threshold problem, however, is that such tax benefits no longer exist for anyone in the State. The Montana Supreme Court invalidated the program on state-law grounds, thereby foreclosing the as-applied challenge petitioners raise here. Indeed, nothing required the state court to uphold the program or the state legislature to maintain it. The Court nevertheless reframes the case and appears to ask whether a longstanding Montana constitutional provision is facially invalid under the Free Exercise Clause, even though petitioners disavowed bringing such a claim. But by resolving a constitutional question not presented, the Court fails to heed Article III principles older than the Religion Clause it expounds. Coleman v. Thompson , 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (forbidding "resolution of a federal question" that "cannot affect" a state-court judgment).
Not only is the Court wrong to decide this case at all, it decides it wrongly. In Trinity Lutheran Church of Columbia, Inc. v. Comer , 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), this Court held, "for the first time, that the Constitution requires the government to provide public funds directly to a church." Id. , at ----, 137 S.Ct., at 2027 (SOTOMAYOR, J., dissenting). Here, the Court invokes that precedent to require a State to subsidize religious schools if it enacts an education tax credit. Because this decision further "slights both our precedents and our history" and "weakens this country's longstanding commitment to a separation of church and state beneficial to both," ibid. , I respectfully dissent.
I
A
The Montana Supreme Court invalidated a state tax-credit program because it was inconsistent with the Montana Constitution's "no-aid provision," Art. X, § 6(1), which forbids government appropriations for sectarian purposes, including funding religious schools. 393 Mont. 446, 467-468, 435 P.3d 603, 614 (2018). In so doing, the court expressly declined to resolve federal constitutional issues. "Having concluded the Tax Credit Program violates" the no-aid provision, the court held, "it is not necessary to consider federal precedent interpreting the First Amendment's less-restrictive Establishment Clause." Ibid. So too the court declined to ground its holding on the Free Exercise Clause. Ibid. The court also remedied the only potential harm of discriminatory treatment by striking down the program altogether. After the state court's decision, neither secular nor sectarian schools receive the program's tax benefits.
Petitioners' free exercise claim is not cognizable. The Free Exercise Clause, the Court has said, protects against "indirect coercion or penalties on the free exercise of religion." Lyng v. Northwest Indian Cemetery Protective Assn. , 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Accordingly, this Court's cases have required not only differential treatment, cf. ante , at 2256 - 2257, but also a resulting *2293 burden on religious exercise, Lyng , 485 U.S. at 450-451, 108 S.Ct. 1319.
Neither differential treatment nor coercion exists here because the Montana Supreme Court invalidated the tax-credit program entirely. 393 Mont. at 467-468, 435 P.3d at 614. Because no secondary school (secular or sectarian) is eligible for benefits, the state court's ruling neither treats petitioners differently based on religion nor burdens their religious exercise. See ante , at 2279 - 2281 (GINSBURG, J., dissenting). Petitioners remain free to send their children to the religious school of their choosing and to exercise their faith.
To be sure, petitioners may want to apply for scholarships and would prefer that Montana subsidize their children's religious education. But this Court had never before held unconstitutional government action that merely failed to benefit religious exercise. "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.' " Lyng , 485 U.S. at 451, 108 S.Ct. 1319 (quoting Sherbert v. Verner , 374 U.S. 398, 412, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring)). Put another way, the Constitution does not compel Montana to create or maintain a tax subsidy.
Notably, petitioners did not allege that the no-aid provision itself caused their harm or that invalidating the entire tax-credit scheme would create independent constitutional concerns. Even now, petitioners disclaim a facial challenge to the no-aid provision. Reply Brief 8, 20-22. Petitioners thus have no cognizable as-applied claim arising from the disparate treatment of religion, because there is no longer a program to which Montana's no-aid provision can apply.
Nor is it enough that petitioners might wish that Montana's no-aid provision were no longer good law. Petitioners identify no disparate treatment traceable to the state constitutional provision that they challenge because the tax-credit program no longer operates. See Simon v. Eastern Ky. Welfare Rights Organization , 426 U.S. 26, 41-42, 44-46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).[1] Short of ordering Montana to create a religious subsidy that Montana law does not permit, there is nothing for this Court to do.[2]
*2294 B
As another dissenting opinion observes, see ante, at 2279 - 2280 (opinion of GINSBURG, J.), the Court sidesteps these obstacles by asking a question that this case does not raise and that the Montana Supreme Court did not answer: whether by excluding "religious schools and affected families from [a scholarship] program," Montana's no-aid provision was "consistent with the Federal Constitution," ante , at 2254 (majority opinion). In so doing, the Court appears to transform petitioners' as-applied challenge into a facial one. Ante , at 2255 - 2256; see also ante , at 2263 (THOMAS, J., concurring).
This approach lacks support in our case law. The Court typically declines to read state-court decisions as impliedly resolving federal questions, especially ones not raised by the parties. See, e.g. , Adams v. Robertson , 520 U.S. 83, 88-89, 117 S.Ct. 1028, 137 L.Ed.2d 203 (1997) (per curiam ). Indeed, to honor principles of comity, this Court generally dismisses writs of certiorari from a State's highest court where, as is true here of the Court's bespoke inquiry, "the sole federal question" the Court seeks to decide was not "raised, preserved, or passed upon in the state courts below." Cardinale v. Louisiana , 394 U.S. 437, 438, 89 S.Ct. 1161, 22 L.Ed.2d 398 (1969) ; see also Webb v. Webb , 451 U.S. 493, 499, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981).
That rule respects not only federalism, but also the separation of powers. Article III confines this Court's authority to adjudicating actual "[c]ases" or "[c]ontroversies." See also Allen v. Wright , 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (case-or-controversy requirement reflects "the idea of separation of powers on which the Federal Government is founded"). Federal courts thus lack power "to decide questions that cannot affect the rights of litigants in the case before them" and may resolve only "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Lewis v. Continental Bank Corp. , 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (alteration in original; internal quotation marks omitted). Consonant with that limitation, the Court has declined to " ' "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." ' "
*2295 Washington State Grange v. Washington State Republican Party , 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting Ashwander v. TVA , 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). By answering an apparent hypothetical question, today's Court subverts these longstanding practices.
True, on occasion this Court has resolved federal constitutional questions when it was unclear whether the state-court judgment rested on an adequate and independent state-law ground. See, e.g. , Michigan v. Long , 463 U.S. 1032, 1043, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). But that is not this case. Recall that the Montana Supreme Court remedied a state constitutional violation by invalidating a state program on state-law grounds, having expressly declined to reach any federal issue. See 393 Mont. at 467-468, 435 P.3d at 614 ; see also ante , at 2280 - 2281 (GINSBURG, J., dissenting).
These principles exist to prevent this Court from issuing advisory opinions, sowing confusion, and muddying the law. This is case in point. Having held that petitioners may not be "exclu[ded] from the scholarship program" that no longer exists, the Court remands to the Montana Supreme Court for "further proceedings not inconsistent with this opinion." Ante , at 2263. But it is hard to tell what this Court wishes the state court to do. There is no program from which petitioners are currently "exclu[ded]," so must the Montana Supreme Court order the State to recreate one? Has this Court just announced its authority to require a state court to order a state legislature to fund religious exercise, overruling centuries of contrary precedent and historical practice? See Cutter v. Wilkinson , 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ; Locke v. Davey , 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ; see also Trinity Lutheran , 582 U.S., at ---- - ----, and nn. 7-11, 137 S.Ct., at 2036-2037, and nn. 7-11 (SOTOMAYOR, J., dissenting) (describing States' religious disestablishment movements near the founding and cataloging state constitutional provisions declining to aid religious ministry). Indeed, it appears that the Court has declared that once Montana created a tax subsidy, it forfeited the right to eliminate it if doing so would harm religion. This is a remarkable result, all the more so because the Court strains to reach it.
The Court views its decision as "simply restor[ing] the status quo established by the Montana Legislature." Ante at 2262, n. 4. But it overlooks how that status quo allowed the State Supreme Court to cure any disparate treatment of religion while still giving effect to a state constitutional provision ratified by the citizens of Montana. Today's decision replaces a remedy chosen by representatives of Montanans and designed to honor the will of the electorate with one that the Court prefers instead.
In sum, the decision below neither upheld a program that "disqualif[ies] some private schools solely because they are religious," ante , at 2261, nor otherwise decided the case on federal grounds. The Court's opinion thus turns on a counterfactual hypothetical it is powerless (and unwise) to decide.
II
Even on its own terms, the Court's answer to its hypothetical question is incorrect. The Court relies principally on Trinity Lutheran , which found that disqualifying an entity from a public benefit "solely because of [the entity's] religious character" could impose "a penalty on the free exercise of religion." 582 U.S., at ---- - ----, 137 S.Ct., at 2021. Trinity Lutheran held that ineligibility for a government *2296 benefit impermissibly burdened a church's religious exercise by "put[ting it] to the choice between being a church and receiving a government benefit." Id. , at ----, 137 S.Ct., at 2024. Invoking that precedent, the Court concludes that Montana must subsidize religious education if it also subsidizes nonreligious education.[3]
The Court's analysis of Montana's defunct tax program reprises the error in Trinity Lutheran . Contra the Court's current approach, our free exercise precedents had long granted the government "some room to recognize the unique status of religious entities and to single them out on that basis for exclusion from otherwise generally applicable laws." Id. , at ----, 137 S.Ct., at 2031 (SOTOMAYOR, J., dissenting).
Until Trinity Lutheran , the right to exercise one's religion did not include a right to have the State pay for that religious practice. See School Dist. of Abington Township v. Schempp , 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). That is because a contrary rule risks reading the Establishment Clause out of the Constitution. Although the Establishment Clause "permit[s] some government funding of secular functions performed by sectarian organizations," the Court's decisions "provide[d] no precedent for the use of public funds to finance religious activities." Rosenberger v. Rector and Visitors of Univ. of Va. , 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring). After all, the government must avoid "an unlawful fostering of religion." Cutter , 544 U.S. at 714, 125 S.Ct. 2113 (internal quotation marks omitted). Thus, to determine the constitutionality of government action that draws lines based on religion, our precedents "carefully considered whether the interests embodied in the Religion Clauses justify that line." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2031 (SOTOMAYOR, J., dissenting). The relevant question had always been not whether a State singles out religious entities, but why it did so.
Here, a State may refuse to extend certain aid programs to religious entities when doing so avoids "historic and substantial" antiestablishment concerns. Locke , 540 U.S. at 725, 124 S.Ct. 1307. Properly understood, this case is no different from Locke because petitioners seek to procure what the plaintiffs in Locke could not: taxpayer funds to support religious schooling.[4] Indeed, one of the concurrences lauds petitioners' spiritual pursuit, acknowledging that they seek state funds for manifestly religious purposes like "teach[ing] religion" so that petitioners may "outwardly and publicly" live out their religious tenets. Ante , at 2275 - 2276 (opinion of GORSUCH, J.). But those deeply religious goals confirm why Montana may properly decline to subsidize religious education. Involvement in such spiritual matters implicates both the Establishment Clause, see Cutter , 544 U.S. at 714, 125 S.Ct. 2113, and the free exercise rights of taxpayers, "denying them the chance to decide for themselves whether and how to *2297 fund religion," Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2036 (SOTOMAYOR, J., dissenting). Previously, this Court recognized that a "prophylactic rule against the use of public funds" for "religious activities" appropriately balanced the Religion Clauses' differing but equally weighty interests. Ibid.
The Court maintains that this case differs from Locke because no pertinent " 'historic and substantial' " tradition supports Montana's decision. Ante , at 2258. But the Court's historical analysis is incomplete at best. For one thing, the Court discounts anything beyond the 1850s as failing to "establish an early American tradition," ante , at 2259, while itself relying on examples from around that time, ante , at 2258. For another, although the States may have had "rich diversity of experience" at the founding, "the story relevant here is one of consistency." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2033 (SOTOMAYOR, J., dissenting); see also id. , at ---- - ----, 137 S.Ct., at 2033-2038 (chronicling state histories). The common thread was that "those who lived under the laws and practices that formed religious establishments made a considered decision that civil government should not fund ministers and their houses of worship." Id. , at ----, 137 S.Ct., at 2035. And as the Court's recent precedent holds, at least some teachers in religiously affiliated schools are ministers who inculcate the faith. See Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC , 565 U.S. 171, 178, 196, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) ; see also ante , at 2275 - 2276 (GORSUCH, J., concurring); ante , at 2284, 2288 (BREYER, J., dissenting).
The Court further suggests that by abstaining from funding religious activity, the State is " 'suppress[ing]' " and "penaliz[ing]" religious activity. Ante , at 2260 - 2262. But a State's decision not to fund religious activity does not "disfavor religion; rather, it represents a valid choice to remain secular in the face of serious establishment and free exercise concerns." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2040 (SOTOMAYOR, J., dissenting). That is, a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." Regan v. Taxation With Representation of Wash. , 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983).
Finally, it is no answer to say that this case involves "discrimination." Ante , at 2256 - 2257. A "decision to treat entities differently based on distinctions that the Religion Clauses make relevant does not amount to discrimination." Trinity Lutheran , 582 U.S., at ----, 137 S.Ct., at 2038-2039 (SOTOMAYOR, J., dissenting). So too here.
* * *
Today's ruling is perverse. Without any need or power to do so, the Court appears to require a State to reinstate a tax-credit program that the Constitution did not demand in the first place. We once recognized that "[w]hile the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs." Schempp , 374 U.S. at 226, 83 S.Ct. 1560 (emphasis deleted). Today's Court, by contrast, rejects the Religion Clauses' balanced values in favor of a new theory of free exercise, and it does so only by setting aside well-established judicial constraints.
I respectfully dissent.

A party wishing to expand the scope of the Establishment Clause beyond its meaning at the founding carries the burden of demonstrating that this broader reading is historically sound. Town of Greece v. Galloway , 572 U.S. 565, 607-608, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (THOMAS, J., concurring in part and concurring in judgment).

This stands in striking contrast to the Court's view in the free speech context that "the burden normally falls upon the viewer" to avoid offense "simply by averting his eyes." Hill v. Colorado , 530 U.S. 703, 753, n. 3, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting) (quoting Erznoznik v. Jacksonville , 422 U.S. 205, 210-211, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) ; quotation altered).

See U.S. Commission on Civil Rights, School Choice: The Blaine Amendments & Anti-Catholicism 36 (2007).

See T. Anbinder, Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s, pp. 6-8 (1992).

Id. , at 127-128, 135.

Id. , at 110 (emphasis deleted).

In its opinion, Montana's highest court stated without explanation that this case is not one in which application of the no-aid provision violates the Free Exercise Clause. 393 Mont. at 468, 435 P.3d at 614. When the court made that statement, it had already invalidated the entire scholarship program. Ibid. Accordingly, the court's statement cannot be understood to have approved of excluding religious schools from an otherwise available scholarship. Instead, the statement is most fairly read to convey that the Free Exercise Clause allows a State to decline to fund any private schools, an outcome that avoids state aid to religious schools.

The Montana Supreme Court's decision leaves parents where they would be had the State never enacted a scholarship program. In that event, no one would argue that Montana was obliged to provide such a program solely for parents who send their children to religious schools. But cf. ante, at 2274 (ALITO, J., concurring) (inapt reference to Anatole France's remark).